**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PALOMAR CORPORATION and Gateway Service Company, Respondents.**

No. 72–1038

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

July 25, 1972.

Rehearing Denied Sept. 7, 1972.

Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Charles N. Steele, Steven C. Kahn, N. L. R. B., Washington, D. C., Clifford W. Potter, Director, Region 23, N. L. R. B., Houston, Tex., for petitioner.

William A. Brown, Powell, Brown & Maverick, Houston, Tex., for respondents.

Before GEWIN, AINSWORTH and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

The National Labor Relations Board (Board), in an order reported at 192 N.L.R.B. No. 98 (August 11, 1971), found the Palomar Corporation and the Gateway Service Company (respondents) had violated Sections 8(a) (5) and (1) [1] of the National Labor Relations Act, as amended, Title 29, U.S.C., Section 151 et seq. Pursuant to Section 10(e) of the Act, the Board has petitioned for enforcement of its remedial order. We grant the Board's petition for enforcement for reasons which we will indicate.

The respondents are Texas corporations with principal offices and places of business in Corpus Christi, Texas. They operate as service contractors pursuant to the Service Contract Act, Title 41, U.S.C., Section 351 et seq., at the Laredo Air Force Base, Laredo, Texas.

Local Union No. 1057, Public Service, Production & Maintenance Employees (Union), has been recognized by respondent Palomar since 1965 as the bargaining agent for its service, production and maintenance employees. During the period April 1, 1969, to April 1, 1970, Palo-

---

* Rule 18, 5 Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al., 5 Cir. 1970, 431 F.2d 409, Part I.

1. Title 29, U.S.C., Section 158:

"(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

*　　*　　*　　*　　*

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

mar was performing both the motor pool maintenance and aircraft refueling functions at the Laredo base and was operating under a collective bargaining agreement with the Union which was effective from June 1, 1969, to September 30, 1970.

The 1969–1970 collective bargaining agreement between Palomar and the Union, which covered employees engaged in both the maintenance and refueling operations, adopted the rates of the then existing "wage determination" issued by the Secretary of Labor pursuant to Title 41, U.S.C., Section 351(a) (1),[2] with the proviso that the affected employees would receive a 30¢ per hour wage increase effective April 1, 1970. It appears that the 30¢ wage increase was predicated upon an expectation that the Secretary of Labor would increase his "wage determination" by that amount effective April 1, 1970.

The Secretary did not promulgate the anticipated increase for the period commencing April 1, 1970; he kept in effect the "wage determination" for the period April 1, 1969 through March 31, 1970. Consequently, the contract bid documents which the Air Force distributed to prospective bidding contractors in December 1969, set forth the wage schedules of April 1, 1969–March 31, 1970 period as the prevailing wages.

In January 1970, Palomar submitted its bid for the April, 1970–April, 1971 Air Force contracts at the Laredo, Texas installation, covering both the motor pool and refueling operations. Its bid was calculated on the basis of wage costs computed at the higher scale for the first six months (reflecting the 30¢ hourly increase provided in the collective bargaining agreement with the Union) and

the lower prevailing wage scale for the remaining six months. In February or March, 1970, Palomar was awarded the motor pool contract and Gateway the aircraft refueling contract for the annual period commencing April 1, 1970.

In late March 1970, Schreiber, Gateway's representative, entered into an oral agreement with Jacobs, the Union's business manager, under which Gateway agreed to recognize the Union and abide by the terms of the Union's agreement with Palomar, except that the wage rate for Gateway's aircraft refueling employees would be reduced by 14¢ per hour. In addition, Gateway unconditionally authorized Smith, Palomar's vice-president, to act as Gateway's collective bargaining representative in all its future dealings with the Union.

In April 1970, and again in August 1970, Smith advised Jacobs that the respondents had decided to revert to the previous wage rate (resulting in a 30¢ hourly wage reduction) at the expiration of the collective bargaining agreement on September 30, 1970. Pursuant to the Union's timely notice to the respondents of its desire to modify the 1969–1970 contract, Smith and Jacobs held three collective bargaining meetings on September 9, September 30 and October 11, 1970.

At the start of the negotiating session on September 9, 1970, Smith announced that the respondents would be forced to revert to the wage determination for the last six months of the Air Force contracts. When Jacobs questioned this proposal, Smith replied: "Well, we're losing money. I don't mind telling you that in refueling . . . we're not doing bad. But we're losing money".

2. Title 41, U.S.C., Section 351, provides in pertinent part as follows:

"(a) Every contract (and any bid specification therefor) entered into by the United States or the District of Columbia in excess of $2,500, except as provided in section 356 of this title, whether negotiated or advertised, the principal purpose of which is to furnish services in the United States through the use of service employees, as defined herein, shall contain the following: (1) A provision specifying the minimum monetary wages to be paid the various classes of service employees in the performance of the contract or any subcontract thereunder, as determined by the Secretary, or his authorized representative, in accordance with prevailing rates for such employees in the locality. . . . "

Jacobs then stated that Palomar had bid $75,000 over the previous year's contract and that he didn't see how Palomar could be losing money. At this point Smith expressed a willingness to permit Jacobs to examine Palomar's books and Jacobs responded to the effect that if the respondents were really losing money, the Union would seriously consider a wage reduction. Jacobs then handed Smith a collective bargaining agreement which contained the Union's entire contract proposal with the exception of wage rates. He assured Smith that the Union was not requesting a wage increase, but did however seek a 2.5¢ increase in health and welfare payments. After a mutual review of the terms of the Union's proposed contract, Jacobs announced that, in view of the respondents' wage reduction proposal, the Union would not pursue its request for an increase in health and welfare payments. At the conclusion of the meeting, Smith on behalf of the respondents agreed to submit a counterproposal to the Union.

The respondents, on September 15, 1970, sent a contract proposal to the Union which incorporated the latest "wage determination" rate. At the September 30, 1970 meeting, Jacobs, after being informed that the respondents were insisting on a wage reduction to the levels promulgated by the Secretary of Labor, pointed out that civil service employees performing similar functions at the Laredo Air Force Base had recently been given wage raises and that it was "unbelievable" that the employers were actually asking the Union to absorb a wage cut. Jacobs again asked to inspect respondents' books to determine if they were losing money, in order for the Union to seriously consider accepting a wage reduction. Smith first stated that his board of directors would not permit the Union to inspect the books, then later in the same meeting indicated that he would refer the matter to the board and advise the Union of its decision. Finally, Smith declined to furnish the financial records, stating that the respondents "were not making the profits

they were entitled to". Thereafter, the two contract proposals (the Union's and that of the respondents) were reviewed by the negotiators, the result being that Smith accepted all the Union's proposals with the exception of wage rates. Smith indicated further that the respondents might consider a wage reduction of an amount less than the 30¢ per hour theretofore under discussion. The meeting concluded on the mutual understanding that bargaining would resume within fifteen days.

Effective October 1, 1970, both respondents unilaterally reduced their wage schedules to the levels set by the Secretary of Labor. On October 10, 1970, Smith wrote the Union that the respondents had reduced the wage rates to the levels set by the Secretary of Labor "in order for us to operate on a competitive basis, and we cannot earn the profit to which we are entitled while paying non-competitive wage rates".

The Union and the respondents had their final meeting on October 11, 1970, under the auspices of the United States Mediation and Conciliation Service. The respondents at that meeting offered to continue paying the wage rates specified in the expired collective bargaining agreement on the condition that the Air Force would pay them the difference for the added costs. The Union rejected this offer and once again asked to inspect the respondents' financial records. The respondents denied this request, asserting that they were under no obligation to show the Union their books. The meeting ended with no agreement being reached.

The Palomar employees went on strike from October 12, 1970, until October 20, 1970, at which time they were fully reinstated to their former positions. The Gateway employees did not strike because the Union did not wish to impede the aircraft refueling operations at the military installation.

The Trial Examiner and the Board found that the respondents had violated Sections 8(a) (5) and (1) of the Act by refusing to furnish the Union, upon re-

quest, financial data in support of the respondents' claim that it was not economically feasible to maintain the existing wage rates. In addition, the Trial Examiner and the Board determined that the respondents' improper refusal to disclose cost data deprived the Union of the meaningful opportunity contemplated by the Act to discuss and negotiate the respondents' proposed wage reduction, and that as a consequence there existed no legally cognizable impasse so as to permit the respondents to institute their wage reduction unilaterally. The Board's order required the respondents to cease and desist from the unfair labor practices found or from in any manner interfering with, restraining or coercing their employees in the exercise of their protected rights. The respondents were affirmatively required to revoke the unilateral wage rate reductions instituted on October 1, 1970 and to revert to the wage scale existing immediately prior to that date, to make whole the employees affected for any loss of pay incurred by reason of the unilateral wage reductions, and to post the customary notices.

In opposition to the Board's petition for enforcement, respondents assert: (1) the Board erred in requiring the respondents to produce their financial records under the bargaining circumstances of this case; (2) the Board erred in requiring the respondents to continue wage rates at the pre-existing levels beyond the expiration of the collective bargaining agreement; and (3) the United States Supreme Court's decision in National Labor Relations Board v. Burns International Services, Inc., 1972, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61, decided May 15, 1972, mandates the denial of enforcement of the Board's order in this matter.

■ In National Labor Relations Board v. Truitt Manufacturing Co., 1956, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027, the Court held that an employer's refusal to attempt to substantiate (by producing its financial records) a claim of economic inability to pay increased wages may support a finding of a failure to bargain in good faith with the collective bargaining representative of its employees. We believe that the *Truitt Manufacturing Company* rationale applies equally to a situation where an employer claims financial inability to continue paying the wage rates specified in a labor-management agreement.

The respondents' position that, during the course of the negotiations with the Union, no claim of economic inability to continue paying the stipulated wage rates was made is not supported in the record. On September 9, 1970, Smith clearly asserted that the respondents were losing money. This contention was modified somewhat when, during the September 30, 1970 negotiating session, Smith claimed that the respondents were not making the profits to which they were entitled. Smith's letter to the Union of October 10, 1970, represented yet another modification of the respondents' position whereby the respondents claimed that the unilateral wage reduction had been put into effect in order to preserve the respondents' competitive positions. Each of the three positions taken by the respondents during the course of negotiations constitutes, in our view, a claim of "economic inability to pay". Applying the teachings of *Truitt Manufacturing Company,* supra, we uphold and refuse to disturb the Board's conclusion that the respondents committed an unfair labor practice by refusing to disclose their financial records to the Union.

In National Labor Relations Board v. Katz, 1962, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230, the Supreme Court was confronted with a situation in which the employer, while he was engaged in negotiations with the union concerning merit increases, sick-leave policy, and wage rates, unilaterally made changes in each of those three areas. The employer defended against the Board's unfair labor practice charge by asserting that the unilateral changes were put into effect only after a bargaining impasse had developed and that the Board could not base a conclusion that a Section 8(a)

(5) violation had taken place on unilateral actions alone without making a finding of the employer's subjective bad faith at the bargaining table. The Supreme Court found ample support in the record for the Board's conclusion that no impasse had been reached prior to the implementation of the unilateral changes and rejected the employer's contention that a finding of the employer's subjective bad faith was a prerequisite to a conclusion that the employer had violated Section 8(a) (5) of the Act. Accordingly, the Court directed enforcement of the Board's remedial order.

■ We agree with the Board that in this case no genuine impasse had been reached between the respondents and the Union prior to the unilateral reduction in wage rates on October 1, 1970. Such an impasse was not possible because, as the Board concluded, the respondents, in refusing to disclose their financial records to the Union, had failed to bargain in good faith as required by Section (8) (d) of the Act. As we stated in National Labor Relations Board v. Herman Sausage Company, 5 Cir. 1960, 275 F.2d 229, 234:

> "Generally speaking, the freedom to grant a unilateral wage increase 'is limited to cases where there has been a bona fide but unsuccessful attempt to reach an agreement with the union, or where the union bears the guilt for having broken off relations'."

The absence of a "bona fide but unsuccessful attempt to reach an agreement with the union" bars the implementation of a unilateral wage reduction as well as the implementation of a wage increase. See further, Cone Mills Corporation v. NLRB, 4 Cir. 1969, 413 F.2d 445, 449; NLRB v. Celotex Corporation, 5 Cir. 1966, 364 F.2d 552, 553, cert. denied 1966, 385 U.S. 987, 87 S.Ct. 601, 17 L.Ed.2d 450. Compare NLRB v. Yutana

Barge Lines, Inc., 9 Cir. 1963, 315 F.2d 524, 529–530.

The respondents' attempt to avail themselves of the Supreme Court's decision in H. K. Porter Company v. National Labor Relations Board, 1970, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146, is without merit. In *H. K. Porter* the Court held that the Board has the power to require employers and employees to negotiate but does not have the power to compel employer to agree to a proposed checkoff clause in the collective bargaining agreement. The case at bar does not involve an attempt by the Board to dictate the terms of a collective bargaining agreement to the parties; all that is involved is the Board's effort to remedy an unfair labor practice on the part of the employer committed during the course of the bargaining process.

Lastly, we perceive no merit in the respondents' contention that the recent *Burns*, supra, decision of the Supreme Court requires us to deny enforcement of the Board's remedial order. The Court in *Burns* held only that a replacement employer was under a Section 8(a) (5) duty to bargain collectively with the recently certified union of the replaced employer's employees, but that the successor employer was not required to abide by the terms of the collective bargaining agreement between the replaced employer and the Union. The respondents assert on brief that the Board proceedings in this case were "infected" by the Board's now-qualified *Burns* doctrine and that the negotiation process between the respondents and the Union, described above, were improperly influenced by the then prevailing Board doctrine regarding successor employers. This line of reasoning is clearly a make-weight argument on the part of the respondents inasmuch as the respondents admit in their brief that the Supreme Court's decision in *Burns* is not directly in point.[3]

---

3. But respondents on brief assert that "The decision is of such significance to the case at bar that no decision herein would be appropriate without consideration of this ruling by the Supreme Court" and urge us to call for supplemental briefs

from the parties addressed to the impact of that decision, *Burns* having been decided May 15, 1972, after the Board's brief was filed April 17, 1972. We decline to engage in what we consider would be a meaningless exercise.

Brief for Respondents, page 39. We fail to perceive any applicability of *Burns* to this case.

The petition of the Board for judicial enforcement of its remedial order is granted.

Enforced.