ELECTRIC MACHINERY COMPANY,
Petitioner-Cross Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent-Cross
Petitioner.

No. 79–2725.

United States Court of Appeals,
Fifth Circuit.

Aug. 17, 1981.

Shackleford, Farrior, Stallings & Evans, Lucius M. Dyal, Jr., Thomas M. Gonzalez, Tampa, Fla., for petitioner-cross respondent.

Elliott Moore, Deputy Associate General Counsel, Allison W. Brown, Jr., Barbara G. Gehring, Robert E. Allen, John E. Higgins, Jr., William A. Lubbers, N.L.R.B., Wash-

ington, D.C., for respondent-cross petitioner.

Harold A. Boire, Regional Director, Region 12, Tampa, Fla., for other interested party.

Mark F. Kelly, Richard H. Frank, Tampa, Fla., for International Brotherhood of Electrical Workers, Local Union No. 915, AFL-CIO.

Before VANCE, FRANK M. JOHNSON, Jr. and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

Petitioner, Electric Machinery Company, seeks review of an order of the National Labor Relations Board in which the Board held that petitioner violated Section 8(a)(5) and, derivatively, Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (1),[1] by unilaterally changing mandatory terms and conditions of employment and by bargaining directly with employees rather than bargaining with the union's elected representatives. The Board also found that petitioner violated Sections 8(a)(3) and (1) (29 U.S.C. §§ 158(a)(3) and (1)),[2] by constructively discharging eighteen employees. Respondent has filed a cross-petition for enforcement. We affirm the Board's determination that petitioner violated Section 8(a)(5), and we reverse the determination that petitioner violated Section 8(a)(3).

## I. *The Facts.*

The facts are largely undisputed. The International Brotherhood of Electrical Workers, Local No. 915, AFL-CIO ("union") has represented Electric Machinery's (the "company") wiring electricians since 1954. During the past 12 years the company has been represented at bargaining sessions by the West Coast Chapter of the National Electrical Contractor's Association ("NECA") which represents electrical contractors who have authorized NECA to bargain on their behalf. At the time of the events which give rise to this suit, the union and the company were parties to a NECA-Union contract effective from December 1, 1976, to November 30, 1977. On June 30, 1977, Electric Machinery revoked NECA's authority to bargain on its behalf and on August 30, 1977, gave timely notice that it intended to terminate the contract on its scheduled expiration date.[3]

The union contended that both the NECA revocation and the notice to terminate were improper, basing their contention upon Article I, Section 2(c), of the collective bargaining agreement which provided that "[t]he existing provisions of the agreement shall remain in full force and effect until a conclusion is reached in the matter of proposed changes." Consequently, the union took no immediate action to commence collective bargaining despite a September 16, 1977, letter from the company which invited it to do so.

On November 17, 1977, Electric Machinery sent the union's business manager, Joseph Cain, a second letter in which the company put forth the specific proposals for terms and conditions of employment which

---

**1.** Sections 8(a)(1) and 8(a)(5) state in relevant part:

> It shall be an unfair labor practice for an employer—
>> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
>
> .    .    .    .    .
>
>> (5) to refuse to bargain collectively with the representatives of his employees, . . . .

**2.** Section 8(a)(3) states in relevant part:

> It shall be an unfair labor practice for an employer—
>> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .

**3.** Article I, § 2(a) of the collective bargaining agreement provides: "Either party desiring to change or terminate this agreement must notify the other in writing at least 90 days prior to the anniversary date."

the company desired to initiate upon expiration of the NECA agreement. It was the company's contention that the high union wage scale, and the accompanying holiday, travel, vacation, and pension benefits, had placed the company in a position of competitive disadvantage and, consequently, that the company was finding it impossible to submit bids that were competitive with other electrical subcontractors. The November 17 letter concluded that "[i]n the event that we have not heard from you or in the event that your union does not make a meaningful offer on or before November 30, 1977, it is our intent to put these wages and working conditions into effect on December 1, 1977."

The union responded to the proposals by requesting a November 22, 1977, meeting. This meeting, which lasted approximately three hours, was the first bargaining session which occurred between the parties and was attended by Electric Machinery's president, Jaime Jurado, the local business manager, Cain, and a representative from the International, John Ericksen. Although the parties did not arrive at any specific agreement, Ericksen nevertheless accompanied Jurado back to the company's offices where the men discussed the competitive bidding problem in greater depth with Electric's estimator. At the conclusion of their discussion, and after preliminary examination of the company's financial records, Ericksen remarked to Jurado that he agreed that some changes in terms and conditions would be necessary in order for the company to become competitive with other area subcontractors.

After the November 22 meeting, Jurado directed counsel to prepare a "Memorandum of Agreement" in advance of the meeting scheduled for the next week, November 28. The agreement stated, among other things, that the parties would acknowledge that the NECA agreement would have no binding effect after November 30, 1977, but that "[t]he company, of its own volition ... will continue to pay wages and provide terms and conditions of employment identical to those provided by the contract for a period of (30) days from

November 30, 1977." The memorandum further stated that "the parties agree that such action does not constitute an extension of the expired agreement." The memorandum itself contained no specific contract proposals.

Sometime during the week between November 22 and November 28, counsel for the union met with Electric Machinery's employees and discussed the management's November 17 proposals for changed terms and conditions of employment. During this meeting, the union members were specifically directed to remain on the job while negotiations continued, and were assured that their union membership would not be penalized or disciplined by the union for continuing work, even if it meant working without a contract until an agreement could be reached.

On November 28, at the outset of the bargaining session, Jurado presented Cain with the prepared "Memorandum of Agreement" and asked him to sign. When Cain refused, Jurado became angry and threatened to walk out of the negotiations. The Administrative Law Judge found that Jurado attempted to induce Cain to sign the memorandum "by indicating he would be willing to agree for six months at thirty day intervals to abide by the terms of the expiring contract while negotiations continued." Cain, however, informed Jurado that he would not sign "because he felt respondent was contractually obligated to abide by the expiring contract while negotiations continued." The bargaining session broke up immediately thereafter, when Jurado stated that he would go directly to the employees and request that they accept the contract modifications which had been outlined in the November 17 letter to the union. On his way out, Ericksen requested that Jurado leave a copy of the memorandum so that the union could consider it further.

The following day, November 29, Jurado began visiting job sites to meet with employees. He handed out copies of the company's November 17 letter which contained

the company's proposals for a new contract and, according to testimony, "practically begged" the employees to stay on with the company and work under the new conditions. Jurado further told the employees they should "contact their foremen if they were not going to stay with [the company]." (R. 32)

Victor Moore, a journeyman electrician, immediately informed Jurado that he could not accept the company's offer and "was going to quit." He, and another employee, Dennis Field, left at the end of the day. On December 1, the company proceeded to implement all of the proposals set out in its November 17 letter to the union, and on December 5, sixteen more employees left their jobs.[4] On December 30 the company signed a new letter of assent designating NECA as its bargaining agent and automatically making it a party to the new NECA-union collective bargaining agreement. Immediately thereafter, a majority of the employees returned to work.

## II.  *Discussion.*

At the outset, we acknowledge that the court of appeals must affirm the National Labor Relations Board if there is "substantial evidence" to support the Board's conclusions. Nevertheless, "Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

In the instant case, the Administrative Law Judge found that the company had violated Section 8(a)(5) and derivatively, Section 8(a)(1) by unilaterally changing mandatory terms and conditions of employ-

ment on December 1, 1977, before having bargained to impasse. Additionally, the ALJ found that, by personally urging its employees to work under the new conditions, the respondent engaged in direct bargaining with individual employees in violation of Sections 8(a)(5) and 8(a)(1). The Board affirmed with respect to both 8(a)(5) violations and we affirm.

It is well-settled that an employer has a duty to consult and negotiate with the union before changing terms and conditions of employment, and violates Section 8(a)(5) of the Act by instituting unilateral changes before negotiations have been given a fair chance to succeed. *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Here the company admits that it unilaterally changed wages and benefits on December 1, but defends its action on the grounds that negotiations with the union were at an impasse and, alternatively, that even if negotiations were not at an impasse, the company had a "reasonable belief" that an impasse had been reached, and therefore was justified in taking unilateral action.

We cannot agree that the company's contentions are supported by the law or the record. In *NLRB v. Katz* the Supreme Court stated:

Clearly, the duty [to bargain] thus defined may be violated without a general failure of subjective good faith; ... [a] refusal to negotiate *in fact* as to any subject which is within § 8(d), and about which the union seeks to negotiate, violates § 8(a)(5) though the employer has every desire to reach agreement with the union.... We hold that an employer's unilateral change in conditions of employment under negotiation is similarly a violation of § 8(a)(5) ....

369 U.S. at 373, 82 S.Ct. at 1111.

■  While the employer urges strenuously its defense of impasse, we do not consider

4. Four of the employees who left work on December 5 testified before the NLRB. Whitely testified that he left because he "didn't feel [the situation] was right." (R. 97) Stallings testified that he left because "he wasn't receiving his full wages ... [and] fringe benefits." (R. 106) Dempsey testified that he left because his

wages, retirement, and health and welfare benefits were cut. (R. 126) Cannella testified that he left because there was "too much tension," and because he "didn't know what [his] pay was going to be, or what [working] conditions were going to be." (R. 135, 138)

this to be an impasse case. In *NLRB v. Big Three Industries, Inc.*, 497 F.2d 43 (5th Cir. 1974), we stated:

> "Impasse" within the meaning of the federal labor laws presupposes a reasonable effort at good faith bargaining which, despite noble intentions, does not conclude in an agreement between the parties. *NLRB v. Palomar Corporation*, 5 Cir. 1972, 465 F.2d 731, 735. Here the company failed to fulfill this necessary precondition to impasse.

*Id.* at 48. Impasse is a deadlock in negotiations and presupposes negotiations. The employer in its brief cites a Board opinion in *Hi-Way Billboards, Inc.*, 206 NLRB 22 (1973), *enf. den. sub nom. NLRB v. Hi-Way Billboards, Inc.*, 500 F.2d 181 (5th Cir. 1974), which provides the following definition of impasse:

> A genuine impasse is synonymous with a deadlock; the parties have discussed a subject or subjects in good faith, and despite their best efforts to achieve agreement with respect to such, neither party is willing to move from its respective position.

206 NLRB at 23.

█ In the present case negotiations had barely begun, the first negotiating session being November 22, 1977. There was a second meeting on November 28 which did not result in any bargaining when the union refused to sign the "Memorandum of Agreement" proposed by the employer. The next day the employer, through its chief executive officer, visited the employees, delivering to them a copy of his November 17 letter to the union outlining proposed contract modifications, which included reductions in wages. As previously noted, the contract expired November 30. The employer points out that the union had been tardy in responding to the employer's notification that the contract would have to be modified so that the company could be more competitive. While the record does reflect this tardiness on the part of the union, it at no time refused to bargain nor did it waive its right to bargain. We note also that the union advised its members to continue working after the expiration of the contract on November 30 while the parties negotiated.

On the record before us there appears no reason which impelled the employer unilaterally to change the wage schedule, institute a company hospitalization plan rather than the union plan, and eliminate the pension plan and other fringe benefits, including vacation fund payments and travel time. The facts do not begin to support a defense of impasse because, as we have previously pointed out, bargaining had only just begun.[5] The fact that the union refus-

---

5. The Fifth Circuit has discussed the subject of impasse in many cases, and we will now make reference to some of them. These cases all differ on their facts. Most acknowledge that the subject of impasse is a difficult one and must take into consideration a myriad of circumstances, such as the background of the relationship between the parties, their willingness to negotiate, the number of bargaining sessions, the degree to which the parties are making legitimate efforts to move toward an agreement as contrasted to sham negotiations which merely consume time, whether the company produces financial information when requested by the union (if the employer is seeking to reduce wages and in some instances when an increase in wages is being negotiated), and the good or bad faith of the parties if such can be determined from the facts, which cannot always be done.

In *NLRB v. Herman Sausage Co.*, 275 F.2d 229 (5th Cir. 1960), our circuit held that "generally speaking, the freedom to grant a unilateral wage increase 'is limited to cases where there has been a bona fide but unsuccessful attempt to reach an agreement with the union, or where the union bears the guilt for having broken off relations.' *NLRB v. Andrew Jergens Co.*, 9 Cir., 1949, 175 F.2d 130, 136, *cert. denied*, 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503."

*NLRB v. Tex-Tan, Inc.*, 318 F.2d 472 (5th Cir. 1963), involved a unilateral wage increase instead of reduction which was approved by this court. The unilateral wage changes were made in March-April, 1960. The opinion indicates that between April, 1959, and June 8, 1960, twenty-nine bargaining sessions were held, and the court notes further in its note 19 that the union early expressed the wish that the wage increases be instituted without awaiting final, total contract agreement.

*NLRB v. Celotex Corp.*, 364 F.2d 552 (5th Cir. 1966), sustained a § 8(a)(5) violation in that an impasse did not exist. The company wanted certain contract revisions which would reduce compensation, making the claim that it wanted

ed to sign the "Memorandum of Agreement" presented to it by the company on November 28 was no reason to make the change. All that agreement proposed to do was to continue the existing agreement for thirty days. The company could have continued to pay wages and benefits as it had been doing, and the workers could have continued in the employment without a contract. The only other imaginable reason would be that the contract terminated on November 30. We held in *NLRB v. SAC Construction Company, Inc.*, 603 F.2d 1155 (5th Cir. 1979), that:

> The duty to refrain from making unilateral changes in those employment conditions subject to mandatory bargaining after termination of an existing contract derived from the employer's statutory duty to bargain collectively, because such changes are tantamount to a refusal to negotiate. *Hinson v. NLRB*, 428 F.2d 133, 137 (8th Cir. 1970); see *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

*Id.* at 1156–57. Therefore, we conclude that the employer instituted unilateral changes which constituted a refusal to bargain collectively with the representatives of its employees in violation of 29 U.S.C. § 158(a)(5).

We next turn to the Board's finding that Jurado violated Section 8(a)(5) by bargaining directly with employees on November 29. The evidence is undisputed that Jurado personally met with employees and attempted to persuade them to accept the proposed contract terms, and appellant has not contended in its brief that this conduct was not violative of Section 8(a)(5). Therefore, we affirm.

The remaining violation which we must consider is whether the eighteen employees who left work between November 29 and December 5, 1977, were constructively discharged in violation of Section 8(a)(3) or whether, as appellant contends, the eighteen employees were either "voluntary quits" or "strikers." The Administrative Law Judge found that the company had not violated Section 8(a)(3) because the "General Counsel has failed to show that Respondent altered the wages . . . to encourage or discourage membership in any labor organization." The Board reversed the Administrative Law Judge based upon its reading of *Superior Sprinkler, Inc.*, 227 NLRB 204 (1976). Having reviewed the record, and

---

to remain competitive. At the same time the company refused to furnish financial information respecting its condition, and this court held that such refusal which led to an impasse did not constitute a valid impasse and thus sustained the Board's finding of a violation.

The case of *A. H. Belo Corp. v. NLRB*, 411 F.2d 959 (5th Cir. 1969), is sometimes cited as an impasse case. Under a rather complicated factual situation, our court sustained the Board's finding that a unilateral increase in vacation benefits without notice to the union was a violation of the Act, but that a wage increase during negotiations to a certain group of employees was not unlawful where the company had given the union notice of the proposed change. In another part of the opinion our court sustained the Board's finding that the company had exhibited an attitude of bad faith and lack of sincere desire to reach an agreement, thus failing in its duty to bargain in good faith. The complexities of that case hardly qualify it as a typical impasse case.

*NLRB v. Palomar Corp.*, 465 F.2d 731 (5th Cir. 1972), is a case extremely close on its facts to the present *Electric Machinery Company* case. The collective bargaining agreement expired September 30, 1970. There were three bargaining meetings on September 9, September 30, and October 11, 1970. The employer reduced the wage rates on October 1, 1970, and had given notice to the union that this would be done. Our court in that opinion held that there existed no legally cognizable impasse.

The case of *Winn-Dixie Stores, Inc. v. NLRB*, 567 F.2d 1343 (5th Cir. 1978), *modified on petition for rehearing*, 575 F.2d 1107, involved certain unilateral changes by the employer during contract negotiations, some of which our court found to constitute violations of the Act and others did not constitute violations. The company did not defend a wage increase, which was given after notice to the union, on the ground of impasse, but defended on the ground that it notified the union that it had an excessive turnover of employees and had to grant the wage increase to meet this problem. Our court approved that company reason for the wage increase.

This note is not intended to review exhaustively the cases in the circuit but is done for the purpose of pointing out some of the authorities and their divergent reasons for finding violations in some cases and not in others.

upon consideration of this court's recent decision, sitting *en banc*, in *NLRB v. Haberman Construction Co.*, 641 F.2d 351 (5th Cir. 1981), we agree with the Administrative Law Judge, and we reverse the Board's finding that Electric Machinery constructively discharged eighteen employees.

Section 8(a)(3) states that it shall be an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." Consequently, as this court stated in *Haberman, supra*:

> There are two elements to a constructive discharge .... First, the employer's conduct must have created working conditions so intolerable that an employee is forced to resign. Second, the employer must have acted "to encourage or discourage membership in any labor organization" within the meaning of section 8(a)(3) of the Act.

*NLRB v. Haberman*, 641 F.2d at 358.

Appellee contends that this court should infer anti-union animus simply by virtue of the fact that the employer unilaterally changed mandatory terms and conditions of employment, thereby placing the employees in a position where they were, in fact, forced to abandon rights guaranteed under the Act. The Board relies upon *Superior Sprinkler, supra*, for this contention, quoting that opinion:

> [The employer] unlawfully refused to bargain with the Union and thus ... offered its employees the choice of accepting the employer's unlawful repudiation of its statutory bargaining obligations and working under unlawfully imposed conditions of employment or quitting their employment.

*Superior Sprinkler*, 227 NLRB at 210.

While we do consider the question of constructive discharge to be close, we do not consider *Superior Sprinkler* to be dispositive for two reasons. First, the facts in the instant case are distinguishable from the facts in *Superior*; second, to consider the present case as presenting a § 8(a)(3) violation, where the conduct was not inherently destructive of important employee rights, would approach eliminating the requirement of proving anti-union animus entirely.

We begin our analysis, as we did in *Haberman, supra*, with the Supreme Court decision in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967). In *Great Dane*, the court concluded that motivation to discourage union membership was indispensable to a Section 8(a)(3) violation unless the employer's conduct fell within the category of " 'inherently destructive' of important employee rights," in which case "no proof of an anti-union motivation" would be required. *Id.* at 1798. Based on *Great Dane*, therefore, the General Counsel has the burden of establishing either that Electric Machinery's conduct was so egregious as to be "inherently destructive of important employee rights," or that Electric Machinery acted with the intent to discourage union membership.

In *Superior Sprinklers*, 227 NLRB 207 (1976), the Board successfully brought the complained of activity within the inherently destructive category by demonstrating facts from which the Board could reasonably infer that the employer had refused to bargain with the intention to discourage union membership. Not only had the employer instituted unilateral changes in mandatory terms and conditions prior to impasse, but the employer had accompanied his actions with express declarations that he would no longer negotiate and that he intended to operate "open shop."

The facts in the instant case do not lead to the same inferences. At the time that Jurado committed the Section 8(a)(5) violation, the Administrative Law Judge found that "Jurado was not threatening to immediately create a non-union company ...." Furthermore, the record yields considerable testimony that the employees were informed by their own union officers to remain on the job even if the parties had not yet arrived at an agreement when the contract expired because the union and the company were still negotiating. Signifi-

cantly, these reassurances occurred even after the November 28 meeting where Jurado had left the bargaining session. Finally, Jurado himself testified that, while discussing the contract with individual employees, he urged them to stay on until the union and the company could arrive at some agreement. None of these facts supports an inference that the company acted with anti-union animus.

In discussing what types of conduct justify such an inference, this court in *Haberman* emphasized especially conduct that "directly and unambiguously penalizes or deters protected activity." *NLRB v. Haberman*, 611 F.2d at 359. The court referred to *Portland Willamette Co. v. NLRB*, 534 F.2d 1331 (9th Cir. 1976), as presenting such an instance of inherently destructive activity. There, the Ninth Circuit Court of Appeals concluded that inherently destructive activity was that which has "far reaching effects which would hinder future bargaining . . . [including] permanent discharge for participation in union activities, [and] granting of superseniority to strike breakers." *Id.* at 1334. None of these is present in the instant case, and we therefore cannot conclude that Electric Machinery's conduct was so egregious as to eliminate the General Counsel's burden of proving anti-union animus. Electric Machinery took no action which would permanently jeopardize future union status and, in fact, three weeks after committing the unfair labor practices discussed above, the company rejoined NECA.

In sharp contrast to *Superior Sprinkler*, the "Memorandum of Agreement" which Jurado proposed evidenced a desire to bargain with the union in good faith. Although Electric Machinery was not contractually bound to follow the terms of the NECA agreement, having given the union timely notice of its intention to terminate in accordance with Article I, § 2(a), of the

collective bargaining agreement, the company was nevertheless willing to abide by the contract for thirty-day intervals lasting up to six months, provided negotiations were proceeding in good faith.[6]

In light of this evidence of good faith, the court finds it impossible to infer anti-union animus. Where, as here, the refusal to bargain caused no permanent future impairment of union rights, the employer brought forward a convincing business justification for his actions, and the employees were encouraged to continue working until the union and the company reached agreement, we see no factual basis from which we can infer anti-union motive. Consequently, we conclude that the employees were not constructively discharged.

ENFORCEMENT AFFIRMED in part.

ENFORCEMENT DENIED in part.

---

6. We are not persuaded by the union's contention that, even after the contract termination date, the company was bound to abide by the contract, based upon the union's interpretation of Article I, § 2(c), because that provision refers solely to "changes" in the agreement and not "termination." Article I, § 2(c) provides:

The existing provisions of the agreement shall remain in full force and effect until a conclusion is reached in the matter of proposed *changes* (emphasis added).