United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 10, 1998 Decided November 13, 1998 

 No. 97-1687

 United States Testing Company, Inc., 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondent

 On Petition for Review and Cross-Application 

 for Enforcement of an Order of the 

 National Labor Relations Board

 Joseph P. Paranac, Jr. argued the cause for petitioner. 
With him on the briefs was David F. Jasinski.

 Richard A. Cohen, Senior Attorney, National Labor Rela-
tions Board, argued the cause for respondent. With him on 
the brief were Linda Sher, Associate General Counsel, and 
John D. Burgoyne, Acting Deputy Associate General Counsel. 


David S. Habenstreit, Supervisory Attorney, entered an ap-
pearance.

 Robert D. Kurnick was on the brief for amicus curiae 
International Brotherhood of Electrical Workers Local Union 
1936.

 Before: Ginsburg, Sentelle and Rogers, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Dissenting opinion filed by Circuit Judge Sentelle.

 Rogers, Circuit Judge: The United States Testing Compa-
ny petitions for review of a decision by the National Labor 
Relations Board finding violations of the National Labor 
Relations Act, 29 U.S.C. s 151 et seq., arising out of the 
Company's failure to provide information requested by the 
International Brotherhood of Electrical Workers Local Union 
1936 ("the Union") during contract negotiations.1 The Union 
requested information about the individual claims experience 
of union and nonunion employees in order to respond to the 
Company's proposal that union employees contribute to the 
medical health benefits plan. The Company provided some 
aggregate health cost information to the Union, but not 
individual claims experience.
 The Board found that the Company rejected the Union's 
request and ordered that the information be turned over 
without identifying the names of the individual claimants. On 
appeal, the Company contends that the Board's findings of 
unfair labor practices were unwarranted because the Board 
failed to support its finding that the Union met its burden to 

__________
 1 The Board concluded that the Company violated s 8(a)(5) and 
(1) of the National Labor Relations Act ("Act"), 29 U.S.C. s 158 
(a)(5), (1), by refusing to furnish the Union with certain medical 
health plan information; s 8(a)(5), and (1), id. s 158(a)(5), (1), by 
implementing its final offer when a bargaining impasse did not 
exist; and s 8(a)(3) and (1), id. s 158(a)(3), (1), by permanently 
replacing striking employees in an unfair labor practice strike and 
refusing to reinstate them immediately when they ended the strike 
and unconditionally offered to return to work. See United States 
Testing Co., 324 N.L.R.B. 136 (1997).

show the relevance of the claims information, and because the 
Board failed to find that the individual claims experience was 
confidential and protected from disclosure under Detroit Edi-
son Co. v. NLRB, 440 U.S. 301 (1979). Because we conclude 
that the Company's contentions fail, we deny the petition and 
grant the Board's cross-application for enforcement of its 
order.

 I.

 The International Brotherhood of Electrical Workers Local 
Union 1936 has represented a small unit of technical employ-
ees at the United States Testing Company for over thirty 
years. When the Company, a consumer products testing 
provider with approximately 85 to 100 employees, experi-
enced an economic downturn, it sought a number of changes 
during contract negotiations beginning in August 1995 for a 
contract set to expire in October. One change was for the 
eleven or so unionized employees to begin making contribu-
tions to their health care costs, in the same amount (thirty 
percent) as nonunion employees.

 Noting that it previously had rejected similar proposals, the 
Union again refused to agree to make contributions and 
stated that before it could make counterproposals to meet the 
Company's request to reduce health care costs by thirty 
percent, it needed certain information: Specifically, the Union 
asked the Company to provide the names of the union and 
nonunion employees (and their dependents) who participated 
in the health plan, the individual claims submitted by each 
plan member, and the benefits paid for each claim for the 
past eight months. The Company took the position that the 
Union did not need, and was not entitled to, the information 
concerning nonunion employees.

 During the course of negotiations, the Company ultimately 
turned over to the Union (1) the premium rate and premium 
paid for union employees, (2) a "benefit and service analysis" 
consisting of the coverage rates, charges, and adjustments for 
medical and dental benefits for all employees, (3) a benefits 
cost analysis that the Company had prepared for single and 


family coverage, showing the monthly premium and the per-
centage of premiums paid by an employee contributing thirty 
percent; (4) the insurance carrier's summary of its experi-
ence monitoring the period of March 1994 through August 
1995, including the total claims and premiums paid and the 
ratio of the two numbers; (5) a list of the names, premiums, 
and claims paid for each union employee; and (6) the total 
amounts of premiums and claims paid for union employees, 
nonunion employees, and for all employees. What the Compa-
ny did not provide were the individual claims by each member 
of the plan (employees and their dependents), showing the 
nature of the claims submitted and benefits paid.

 The Administrative Law Judge ("ALJ") found that the 
information the Company provided to the Union was insuffi-
cient because it did not adequately identify the costs of the 
benefits. To the extent that the Company was proposing that 
union employees contribute towards the payment of the high 
costs of claims by nonunion employees (and their depen-
dents), the ALJ found that the information sought by the 
Union was relevant. The Union explained that it sought to 
determine what types of claims generated the highest costs; 
for that, it needed individual claims information.2 According 
to the ALJ, the Union's position was that if most of the large 
claims were for surgeries as opposed to physicians' visits and 
x-rays, the Union would examine the plan to determine 
whether the existing coverage for surgery could be changed 
to reduce costs. As an alternative to a thirty-percent contri-
bution, the Union might propose managed care, pre-
admission testing, outpatient surgery, a higher deductible, or 
a required co-payment. The ALJ noted that the Company's 
explanation in its pretrial affidavit for not providing the 
information was simply that the Union had failed to explain 
why the individual claims were relevant; the affidavit made 
no mention of a concern about privacy. Nevertheless, the 

__________
 2 At the hearing before the ALJ, the Union explained that its 
request did not include information about the individual medical 
diagnosis of any plan member (as distinct from the treatment or 
service provided), only the amount of the bill for the medical 
services and the amount actually paid by the carrier.

ALJ concluded that the Company's bargaining notes reflected 
that it had raised a legitimate concern about privacy early in 
the negotiations regarding the names of the claimants, which, 
if connected with the claim itself, might reveal private medical 
information. Therefore, in ordering the Company to turn 
over the individual claims information, the ALJ directed that 
the names of the claimants not be disclosed.

 The Board adopted the ALJ's findings and conclusions. 
Based on the information the Company supplied showing that 
the claims experience of union and nonunion employees was 
quite divergent, the Union was entitled to examine the issue 
and thereby justify its position that union employees need not 
contribute. Noting that health care costs are clearly a sub-
ject of mandatory bargaining and have become an increasing-
ly important issue as the costs have risen, the Board observed 
that the Company

 should not have been surprised that the Union was 
 seeking more than to juggle premium formulas, the role 
 to which the [Company] wished to confine it, but rather 
 sought to participate meaningfully in structuring the 
 benefits for which the [Company] wanted the bargaining 
 unit to pay. In seeking to play a role in the solution, 
 rather than simply making a substantial concession on 
 the [Company's] say-so, the Union was fulfilling its role 
 as the employees' statutory bargaining representative.

However, as the ALJ found, the names of the individual 
claimants were irrelevant and the Board adopted the ALJ's 
recommended order denying the Union access to that infor-
mation, clarifying that the Union was entitled to the rest of 
the individual claims information without having to renew its 
request. In addition to concluding that the Company violated 
s 8(a)(5) and (1) by rejecting the Union's request for relevant 
information, the Board also concluded that the Company 
unlawfully declared an impasse and violated s 8(a)(3) and (1) 
by refusing to rehire the striking workers. The Company 
challenges all of the Board's findings of unfair labor practices.


 II.

 The Company contends that the Board erred in two re-
spects in ruling that the Company should have complied with 
the Union's request for the medical claims histories of the 
nonunion employees and their dependents: first, because its 
finding that the Union met its burden to show the relevance 
of the claims information is unsupported by the record and, 
second, in any event, the information was confidential and 
thus protected from disclosure under Detroit Edison. The 
Company further contends that the findings that no lawful 
impasse existed between the parties, especially given the time 
devoted to bargaining and the Union's bad faith, and that the 
strike by union employees was an unfair labor practice strike 
are unsupported by substantial evidence. Consequently, the 
Company contends, it was entitled to implement its final offer 
and did not commit unfair labor practices by hiring perma-
nent replacements and refusing to rehire the union employees 
engaging in an economic strike.

 The court applies the familiar substantial evidence test to 
the Board's findings of fact and application of law to the facts, 
see NLRB v. United Ins. Co., 390 U.S. 254, 260 (1968); 
Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951), 
and accords due deference to the reasonable inferences that 
the Board draws from the evidence, see Peoples Gas Sys., 
Inc. v. NLRB, 629 F.2d 35, 42 (D.C. Cir. 1980), regardless of 
whether the court might have reached a different conclusion 
de novo. Universal Camera, 340 U.S. at 488.

 The duty to bargain collectively "includes a duty to provide 
relevant information needed by a labor union for the proper 
performance of its duties as the employees' bargaining repre-
sentative." Detroit Edison, 440 U.S. at 303. In evaluating 
an employer's obligation to satisfy a union's request for 
information, this Court has long adhered to the view that the 
Board is to apply a liberal discovery-type standard, under 
which the requested information need only be relevant to the 
union in its negotiations. Oil, Chemical & Atomic Workers 
Local Union No. 6-418 v. NLRB, 711 F.2d 348, 359-60 (D.C. 
Cir. 1983) (citations omitted); see General Elec. Co. v. NLRB, 

916 F.2d 1163, 1168 (7th Cir. 1990). Relevance is broadly 
construed, and in the absence of a countervailing interest, any 
requested information that has a bearing on the bargaining 
process must be disclosed. Oil, Chemical, 711 F.2d at 359-
60. For information about employees in the bargaining unit, 
it is presumed that the requested information is relevant to 
the union's negotiations, and the employer must provide the 
information unless it can show the information is irrelevant. 
Id. at 359; General Elec., 916 F.2d at 1171. By contrast, the 
burden is on the union to demonstrate the relevance of 
information about nonunion employees. Oil, Chemical, 711 
F.2d at 359.

 The Company maintains that the only indication the Union 
gave during their bargaining sessions for wanting the individ-
ual claims information was to be able to "intelligently and 
fairly respond" to the Company's proposal that union employ-
ees contribute thirty percent of the health plan costs. This 
bare assertion without further explanation, the Company 
maintains, fails to satisfy the Union's burden to show rele-
vance. To the extent the Union envisioned proposals for 
increasing employees' co-payments, out-of-pocket expenses, 
or raising deductibles, the Company maintains that the Union 
could not meet its burden by relying on explanations first 
articulated in the hearing before the ALJ; that these expla-
nations were insufficient; that expert evidence showed that 
the envisioned counterproposals did not require the Union to 
have the requested individual claims information; and that 
the Union never expressed any concern about the difference 
in the claims experience of union and nonunion employees.

 Yet context is everything. The Union's generic statement 
requesting the information was made in response to the 
Company's proposal for a thirty-percent contribution by Un-
ion employees to the company-wide health insurance plan. 
By invoking rising health care costs, the Company necessarily 
put on the table the experience under the current plan. It 
follows that the Union met its minimal burden of establishing 
the relevance of the requested claims and benefits informa-
tion about nonunion employees (and their dependents), who 
constituted the overwhelming majority of those covered by 


the health plan. Before deciding on a particular response to 
the Company's proposed thirty-percent contribution, the Un-
ion needed to know where the heavy claims usage was in 
order to formulate intelligent counterproposals; a union offi-
cial testified that this is what he told the Company during 
negotiations. The information that the Union received from 
the Company showed a significant difference between the 
costs to the carrier for nonunion and union employees. By 
comparison with 1994, in which the ratio of benefits claimed 
to premiums paid for nonunion employees was 6 percent 
greater than that for union employees, in 1995, the same ratio 
was 79 percent higher for nonunion employees than for union 
employees. Further, in 1995 the claims paid to non-union 
employees exceeded the premiums they paid, in contrast to 
the situation of the union members. In short, the claims 
experience for non-union employees was unprofitable for the 
Company while the experience for union employees was prof-
itable. With this information, the Union understandably 
would want to examine the individual claims and usage expe-
rience of the majority, nonunion, employees.

 Thus, the Company's contention that it had insufficient 
notice of the potential relevance of the requested information 
stems either from its own misunderstanding or from a pre-
conceived notion that the Union's counterproposals could not 
include changes to the set of benefits provided under the 
current plan. In National Union of Hospital & Health Care 
Employees, 248 N.L.R.B. 631 (1980), enforcement granted, 
673 F.2d 1314 (4th Cir. 1981), when the Union sought to 
increase the employer's contribution to the Union Benefit 
Fund and the employer discovered that its contribution ex-
ceeded the costs of benefits to its employees, the employer 
sought financial information from the Union about the other 
individual employers who were contributing to the Fund. 
Although the employer never explicitly explained why all of 
the requested information was needed, the Board found that 
the Union was sufficiently informed why it was relevant to 
the employer's collective-bargaining duty. Id. at 632; see 
also NLRB v. Brazos Elec. Power Coop., 615 F.2d 1100, 1101 
(5th Cir. 1980); AT&T, 309 N.L.R.B. 925, 928-29 (1992). So 


too here the Union adequately informed the Company why it 
needed the information; the Company had sufficient notice at 
the time of bargaining that the information requested was 
needed for, and thus relevant to, the Union's negotiations.

 The expert testimony offered by the Company does not 
change our conclusion. An insurance underwriter testified to 
the effect that the Union's request for individual claims 
information was unnecessary to formulate alternative propos-
als. Yet, as the ALJ noted, the underwriter focused on the 
Company's current health plan costs and adjustments that 
could be made by various cost-shifting arrangements without 
additional information. The expert's opinion did not address 
whether the individual claims information would be relevant 
to formulating a change in the Company's health plan itself, 
such as cutting certain benefits or conditioning certain kinds 
of coverage. Specifically, the underwriter focused on aggre-
gate costs and benefits information bereft of any data show-
ing individual claims experience that revealed what types of 
health care services were used most often and their costs. 
Although the ALJ credited the underwriter's testimony that 
the claims information sought by the Union was irrelevant to 
the impact on the costs of the Company's medical health 
insurance plan, the ALJ properly concluded that it was 
relevant to the Union's formulation of counterproposals to 
reduce health care costs by restructuring parts of the plan.

 Insofar as the Company contends that the Board erred in 
failing to find that the individual claims information for 
nonunion employees was confidential and, therefore, unavail-
able to the Union, the Company attempted neither to redact 
the requested information nor to explain why that was not 
possible. Yet it has long been established that the employer 
has the burden of seeking to accommodate the union's re-
quest for relevant information consistent with other interests 
rightfully to be protected. See, e.g., Oil, Chemical, 711 F.2d 
at 362; Tritac Corp., 286 N.L.R.B. 522, 522 (1987). An 
employer is not relieved of its obligation to turn over relevant 
information simply by invoking concerns about confidentiality, 
but must offer to accommodate both its concern and its 
bargaining obligations, as is often done by making an offer to 


release information conditionally or by placing restrictions on 
the use of that information. See, e.g., East Tennessee Baptist 
Hosp. v. NLRB, 6 F.3d 1139, 1144 (6th Cir. 1993);3 E.W. 
Buschman Co. v. NLRB, 820 F.2d 206, 208-09 (6th Cir. 1987); 
Safeway Stores, Inc. v. NLRB, 691 F.2d 953, 958 (10th Cir. 
1982).

 Having made a reasonable accommodation the employer 
avoids a Board finding that it violated s 8(a)(5). See, e.g., 
Detroit Edison, 440 U.S. at 319-20; Buschman, 820 F.2d at 
209; Soule Glass & Glazing Co. v. NLRB, 652 F.2d 1055, 
1098 (1st Cir. 1981), abrogated on other grounds, NLRB v. 
Curtin Matheson Scientific, Inc., 494 U.S. 775, 786 n.7, 796 
(1990). The rationale for this placement of the burden de-
rives from the interest in allowing the parties to work out 
through an informal process how their corresponding duties 
and responsibilities can be met. See H.K. Porter Co. v. 
NLRB, 397 U.S. 99, 103 (1970); NLRB v. Acme Indus. Co., 
385 U.S. 432, 437-38 (1967); NLRB v. Truitt Mfg. Co., 351 
U.S. 149, 152 (1956); Oil, Chemical, 711 F.2d at 358; Florida 
Steel Corp. v. NLRB, 601 F.2d 125, 129 (4th Cir. 1979). In 
other words, the onus is on the employer because it is in the 

__________
 3 In East Tennessee, the union requested wage and attendance 
records on non-union employees in order to verify that union and 
non-union employees were treated equally, as called for in the 
parties' collective bargaining agreement. The Hospital raised confi-
dentiality concerns and suggested first, that a mutually agreed upon 
certified public accountant be hired to review the wage records and 
report if there were any violations of the collective bargaining 
agreement, and second, to provide only the records of non-union 
employees whom the union could identify as suspected of having 
received better treatment with regard to absenteeism. 6 F.3d at 
1141, 1142. The Sixth Circuit reversed the Board, concluding that 
the Hospital had "offered reasonable alternative solutions which 
would have allowed the union to ascertain whether the contracts 
were evenly applied while protecting the confidential records of non 
uni[on] employees." Id. at 1144-45. Under those circumstances, 
the court concluded, "it was incumbent upon the Union to demon-
strate that its need ... outweighed the Hospital's interest in 
maintaining the confidentiality of its records: Id. at 1144.

better position to propose how best it can respond to a union 
request for information. The union need not propose the 
precise alternative to providing the information unedited. Oil 
Chemical, 711 F.2d at 362-63; Tritac Corp., 286 N.L.R.B. at 
522.

 The Company's contention that the Union was not entitled 
to the individual claims information of nonunion employees 
draws heavily on the protection given to employee privacy 
rights by the Supreme Court in Detroit Edison, 440 U.S. 301. 
In that case, the union filed a grievance that senior employees 
were being bypassed for promotion on the basis of their 
scores on a new aptitude test that purportedly measured their 
ability to acquire the necessary job skills. Id. at 305. The 
union sought the actual test that was administered and the 
individual applicants' test papers and scores in order to 
evaluate the accuracy and relevancy of the testing system. 
Id. at 308. In reversing the Board's order to release the 
individual test scores to the union in the absence of the 
employees' consent, the Supreme Court emphasized the im-
portance of protecting the privacy of individual employees 
who undoubtedly would be sensitive "to disclosure of informa-
tion that may be taken to bear on his or her basic compe-
tence." Id. at 318. In light of the employer's legitimate 
interest in preserving confidentiality, the Court concluded 
that although the union's request for information was argu-
ably relevant, the employer sufficiently accommodated that 
request, and fulfilled its statutory duty to bargain, by offering 
to disclose the information upon the employees' written con-
sent. Id. at 318-20.

 The Company was undoubtedly correct to raise concerns 
about the privacy rights of the non-union employees. See 
United States v. Westinghouse Elec. Corp., 638 F.2d 570, 577 
(3rd Cir. 1980); cf. Fed. R. Civ. P. 35. The Company, 
however, never attempted to redact the requested informa-
tion, and never even claimed that it would be unduly burden-
some or costly to do so. Even now the Company makes no 
claim that consent or notice or some other means of protect-
ing employees' privacy rights could not have been achieved. 
Indeed, the Company had ready access to the information 


that the Union sought, specifically in the form of the insur-
ance carrier's "explanation of benefits" statement listing the 
services, the provider of the services, the date rendered, the 
total costs, and the amount payable by the carrier in benefits. 
Information about health care costs for employees and their 
dependents was not, so far as the record reveals, otherwise 
available to the Union.

 In any event, since the Company made no effort to accom-
modate the Union's request for individual claims information, 
by redaction or otherwise, the Board was not required to 
decide whether a particular form of accommodation was 
sufficient and did not unduly restrict the information that the 
Union requested. As ordered by the Board, the confidentiali-
ty of their identities as to specific medical claims is protected. 
See Johns-Mansville Sales Corp., 252 N.L.R.B. 368, 368 
(1980).

 To the extent that the Union sought individual claims 
history, the Board likewise could properly find that the 
Company rejected the Union's request. The Company's sug-
gestion that the summaries and cost benefit analyses that it 
provided somehow reflects the type of accommodation con-
templated by Detroit Edison is unpersuasive. The informa-
tion that the Company provided did not enable the Union to 
develop alternative proposals other than those in the nature 
of the Company's proposal for a percentage-cost contribution. 
Nothing required the Union to confine its thinking on cutting 
the Company's health care costs to the current plan, and to 
the extent the Company attempted to do so, it was interfering 
with the Union's ability to fulfill its responsibility to represent 
its members' interests in bargaining. See Nat'l Union of 
Hospital & Health Care Employees, 248 N.L.R.B. at 633.

 In light of the foregoing, this court can quickly dispose of 
the Company's other contentions. Its unlawful refusal to 
supply the requested medical claims information precluded 
the Company from declaring an impasse. See, e.g., NLRB v. 
Palomar Corp. 465 F.2d 731, 734-35 (5th Cir. 1972); Cone 
Mills Corp. v. NLRB, 413 F.2d 445, 449-50 (4th Cir. 1969). 
Because no genuine impasse was reached, the Company could 


not lawfully implement the terms of its final offer. See, e.g., 
NLRB v. Katz, 369 U.S. 736, 741-42 (1962); Palomar, 465 
F.2d at 734-35; Cone Mills, 413 F.2d at 449-50. Therefore, 
the union employees' refusal to return to work under the 
terms of the Company's final offer constituted an unfair labor 
practice strike rather than an economic strike. See, e.g., 
NLRB v. Int'l Van Lines, 409 U.S. 48, 50-51 (1972); General 
Indus. Employees Union, Local 42 v. NLRB, 951 F.2d 1308, 
1311 (D.C. Cir. 1991).

 Accordingly, we deny the petition and grant the Board's 
cross-application for enforcement of its order of October 29, 
1997.

 Sentelle, Circuit Judge, dissenting: I do not quarrel with 
the majority's basic statement of the facts. I restate a few 
for emphasis.

 In the course of contract negotiations, the International 
Brotherhood of Electrical Workers Local Union 1936 ("the 
Union") sought disclosure of claims information concerning 
the health benefit plan of petitioner United States Testing 
Company. As the majority recognizes:

 [T]he Company ultimately turned over to the Union (1) 
 the premium rate and premium paid for union employ-
 ees, (2) a "benefit and service analysis" consisting of the 
 coverage rates, charges, and adjustments for medical and 
 dental benefits for all employees, (3) a benefits cost 
 analysis that the Company had prepared for single and 
 family coverage, showing the monthly premium and the 
 percentage of premiums paid by an employee contribut-
 ing thirty per cent; (4) the insurance carrier's summary 
 of its experience monitoring the period of March 1994 
 through August 1995, including the total claims and 
 premiums paid and the ratio of the two numbers; (5) a list of 
 the names, premiums, and claims paid for each union 
 employee; and (6) the total amounts of premiums and 
 claims paid for union employees, nonunion employees, 
 and for all employees.

Maj. Op. at 3-4.

 The only thing that the Union wanted that the petitioner 
did not turn over was the individual claims made by nonunion 
individual employees and their dependents, showing the na-
ture of the claims submitted and the benefits paid. The only 
showing of relevance that the Union made for the demand for 
this personal information was the insistence that it needed it 
to be able to "intelligently and fairly" respond to the proposal 
by petitioner that Union employees contribute thirty percent 
of the health plan costs. Nevertheless, 


the majority maintains that the company was required to 
divine the relevance of the requested information from the 
"context" of the negotiations. Id. at 7. Such a requirement 
is inconsistent even with the liberal "discovery-type standard" 
used in determining relevance since the Union had the bur-
den of demonstrating the relevance of information relating to 
nonunion employees. See Oil, Chemical & Atomic Workers 
Local Union No. 6-418 v. NLRB, 711 F.2d 348, 359 (D.C. Cir. 
1983).

 I emphasize again that it claimed to need this information 
in addition to the six categories of information the company 
had already provided. For this failing, the company, not the 
Union, was cited for and found guilty of an unfair labor 
practice by the National Labor Relations Board. The court 
upholds that Board decision.

 As the majority recognizes, the Supreme Court has afford-
ed to management the right to protect the privacy interests of 
its employees in complying with Union demands even for 
relevant information. Detroit Edison Co. v. NLRB, 440 U.S. 
301 (1979). Assuming that the Union's minimum showing of 
relevance in the present case is sufficient, I fail to see how 
the privacy interest could be much higher than we have 
before us in the case today. The Union, armed with its 
generic desire to "intelligently" represent its members, de-
mands the individualized detail on the medical history of the 
nonunion workers whom it neither does nor can represent. 
The majority faults the petitioner for not furnishing the 
information in a redacted form, but neither the majority nor 
the Board explains why the six categories of information 
furnished are not at least the functional equivalent of redact-
ed claims so far as relevance to negotiation is concerned nor 
explains how redaction would be adequate protection for the 
privacy of employees in a workforce no greater than 200 in 
number in which identity might well be surmised by even 
redacted medical data. As in the case of relevance, I would 
place the burden of proof concerning the adequacy of the 
company's accommodation on the Union. Where a company 
has "raised its concern over the confidentiality of the records 
involved," it becomes "incumbent upon the Union to demon-


strate that its need for the materials outweighed the [compa-
ny's] interest in maintaining the confidentiality of the rec-
ords." East Tennessee Baptist Hosp. v. NLRB, 6 F.3d 1139, 
1144 (6th Cir. 1996). Here, the Union has not come close to 
meeting its burden of proof.

 Indeed, even if the burden of proof were on the company, I 
would still hold that the company adequately accommodated 
the Union's request. In order to address confidentiality 
concerns, the company merely refused to provide the Union 
with the information in the form and manner it demanded. 
Instead of providing individual claims data for the nonunion 
employees, the company provided a wealth of claims informa-
tion, including the aggregate "total claims and premiums 
paid" for nonunion employees. Yet, a "refusal to disclose the 
requested records in the form and manner demanded by the 
Union" does not constitute a failure to bargain. Id. at 1143-
44. Moreover, the Union itself was unyielding in its demands 
and proposed no accommodations that might be agreeable to 
both parties. The Union did not even propose the accommo-
dation ultimately implemented by the NLRB order--redac-
tion of the names on individual claims. Therefore, under the 
circumstances, the company's attempts to accommodate the 
Union, far from being nonexistent as the majority suggests, 
were more than adequate.

 In sum, the majority fails to grasp the significance of the 
privacy interests at stake in this case and to appreciate the 
lengths to which the company went to provide the Union with 
the information it requested while protecting the privacy of 
nonunion employees. As in Detroit Edison, in the instant 
case there is a "total absence of evidence that the [company] 
fabricated concern for employee confidentiality only to frus-
trate the Union in the discharge of its responsibilities." 440 
U.S. at 319-20. Therefore, I would grant the petition for 
review.