United States Court of Appeals,

Eleventh Circuit.

No. 96-6944.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

TRIPLE A FIRE PROTECTION, INC., Respondent,

Road Sprinkler Fitters Local Union 669, AFL-CIO, Intervenor.

March 3, 1998

Application for Enforcement of an Order of the National Labor Relations Board. (315 NLRB No. 55).

Before ANDERSON and COX, Circuit Judges, and ALARCON*, Senior Circuit Judge.

ANDERSON, Circuit Judge:

The National Labor Relations Board seeks enforcement of its October 31, 1994 order finding Triple A Fire Protection, Inc. in violation of sections 8(a)(1) and (5) of the National Labor Relations Act for unilaterally ceasing to make payments to fringe benefit plans, unilaterally reducing wage rates of bargaining unit employees, and directly dealing with employees outside the formal bargaining process. 29 U.S.C. §§ 158(a)(1) and (5). The employer argues in its defense that the union never represented an uncoerced majority, that an impasse existed, that the union bargained in bad faith, and that an economic emergency justified their departure from the formal system of labor negotiations. We find substantial evidence to support the Board's findings and enforce its order.

## I. BACKGROUND

*Honorable Arthur L. Alarcon, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by Designation.

Triple A Fire Protection, Inc. ("Triple A") was formed in 1983 by Alton Turner ("Turner") and engages in the business of installing and maintaining sprinkler and fire protection systems in Mobile, Alabama. Turner holds a controlling interest in the company's stock and his wife Lovina owns the remainder of the stock. Turner's son Steve also works for the company as a supervisor.

Since its founding, Triple A's employees have been represented by Road Sprinkler Fitters Union No. 669 ("Local 669"). Local 669 is headquartered in Landover, Maryland. Ronnie L. Phillips ("Phillips") is Local 669's regional representative and business agent in the southern district, which comprises Alabama, Mississippi, and Puerto Rico. Since 1983, Phillips has represented Local 669 in all dealings with Turner and Triple A.

In October 1983, Turner (who had himself been a long-time member of Local 669) signed an agreement to be bound by the 1982-85 national agreement between the union and the National Fire Sprinkler Association, a multi-employer collective bargaining unit. Similarly, on February 8, 1984, Turner signed an "assent and interim agreement" binding Triple A to the 1985-88 section 8(f) prehire national agreement between the union and the national bargaining unit. 29 U.S.C. § 158(f).[1]

---

[1] Section 8(f) authorizes prehire contracts between employees and unions in the building and construction industries. Under section 8(f), an employer may enter into a prehire agreement with a union before a majority of employees has approved the union as its bargaining representative. This sanctioning of prehire agreements is an exception to the general rule of the National Labor Relations Act that guarantees employees the right to select their own bargaining representatives. Normally, in industries other than the construction industry, a union must be elected by a majority of the employees within a bargaining unit before that union can have the right to represent employees in the formal bargaining process pursuant to section 9(a). 29 U.S.C. § 159(a).

Section 8(f) was created to deal with problems unique to the building and construction industries. Prior to the creation of section 8(f), the National Labor Relations Act prohibited employers from bargaining with an uncertified union and, under the Act, a union could not be certified as a bargaining representative until after employees were hired. Since the nature of the construction industry required employers to know their labor costs before the beginning of a project, Congress validated the practice of creating prehire contracts.

In February, 1987, the National Labor Relations Board decided *John Deklewa & Sons,* 282 NLRB 1375, *enf'd sub nom, Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers Local No. 3 v. NLRB,* 843 F.2d 770 (3rd Cir.1988), *cert. denied,* 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988). The Board's decision in *Deklewa* substantially altered the relationship between construction industry employers and unions. The Board decided that section 8(f) prehire agreements were no longer terminable at will, but were valid and binding for the entire term of the contract. Also, the Board held that unions would not enjoy a presumption of majority status upon expiration of a section 8(f) agreement. *See U.S. Mosaic Tile Co. v. NLRB,* 935 F.2d 1249, 1252 n. 2 (11th Cir.1991)(detailing the history of section 8(f) prehire agreements and the changes brought about by *Deklewa*). Of significance for this case, *Deklewa* abandoned the former "conversion doctrine" under which unions could very easily convert their status from that of a section 8(f) prehire to a full section 9(a) status.[2] 29 U.S.C. § 159(a). *Deklewa* adopted a new and much stricter "conversion doctrine," under which the party asserting conversion has the burden of proving section 9(a) status, for example, either by election and Board certification or by voluntary recognition based upon a clear showing of majority support. *Deklewa,* 282 NLRB at 1385 n. 41, 1387 n. 53.[3] Upon conversion to

---

[2]The pre-*Deklewa* cases permitted conversion to full section 9(a) status merely by showing that the union enjoyed majority support among the relevant employees at virtually any time after signing a section 8(f) agreement. *Deklewa,* 282 NLRB at 1378 nn. 12-13.

[3]The Board wrote that "[i]n light of the legislative history and the traditional prevailing practice in the construction industry, we will require the party asserting the existence of a 9(a) relationship to prove it." *Deklewa,* 282 NLRB at 1385 n. 41. Furthermore, the Board stated:

> We do not mean to suggest that the normal presumptions would not flow from voluntary recognition accorded to a union by the employer of a stable work force where that recognition is based on a clear showing of majority support among the unit employees, e.g., a valid card majority. That is, nothing in this opinion is meant to suggest that unions have less favored status with respect to construction industry employers than they possess with respect to those outside the construction industry.

full section 9(a) status, a union would enjoy all the rights of a majority representative under section 9(a), including a presumption of majority support upon expiration of a collective bargaining agreement and the correlative duty to bargain with respect to a new contract. Thus, after *Deklewa* the question of whether a union for a construction industry employer had satisfied the new and stricter "conversion doctrine" and achieved section 9(a) status became very important for both unions and employers.[4]

In light of the uncertainty raised by *Deklewa,* Local 669's business manager in Maryland mailed a letter with enclosures to Triple A. The letter stated that "[*Deklewa*] may throw into question the nature of the relationship between your organization and Local 669. The purpose of this letter is to solicit your cooperation in minimizing any possible disruption in our relationship that might otherwise be caused by the *Deklewa* decision." The letter requested that Triple A sign and return a recognition form confirming the union's status as the exclusive bargaining representative designated by a majority of Triple A's employees pursuant to section 9(a) of the Act. The recognition form provided:

> ACKNOWLEDGMENT OF THE REPRESENTATIVE STATUS OF ROAD SPRINKLER FITTERS LOCAL UNION NO. 669, U.A., AFL-CIO

---

*Id.* at 1387 n. 53 (citation omitted).

[4]It should be noted that this circuit has previously declined to specifically address *Deklewa. See Local Union 48 Sheet Metal Workers v. S.L. Pappas & Co., Inc.* 106 F.3d 970, 974-75 (11th Cir.1997); *U.S. Mosaic Tile, supra; Plumbers and Pipefitters Local Union 72 v. John Payne Co., Inc.,* 850 F.2d 1535, 1538 (11th Cir.1988). Those cases addressed different issues from the conversion by voluntary recognition issue before us. In *Pappas,* the court observed our prior panel rule and followed the reasoning of *John Payne* concerning the ability of employers to repudiate section 8(f) agreements. *Pappas,* 106 F.3d at 975. Similarly, in *Mosaic* this court refused to address the use of *Deklewa* as an affirmative defense because the issue had not been raised in a timely fashion. *Mosaic,* 935 F.2d at 1257. The question before this court concerns issues involving *Deklewa* not addressed in the former cases and not affected by their determinations.

The employer executing this document below has, on the basis of objective and reliable information, confirmed that a clear majority of the sprinkler fitters in its employ have designated, are members of, and are represented by, Road Sprinkler Fitters Union No. 669, U.S., AFL-CIO, for purposes of collective bargaining.

The employer therefore unconditionally acknowledges and confirms that Local 669 is the exclusive bargaining representative of its sprinkler fitter employees pursuant to Section 9(a) of the National Labor Relations Act.

Accompanying the letter, Local 669 included a copy of a recent fringe benefit report filed by Triple A with the National Automatic Sprinkler Industry Fringe Benefit Funds listing eight names, including Turner and his son Steve. Turner testified before the administrative law judge ("ALJ") that the greatest number of workers employed in any given month was seven to eight. Alton Turner signed the recognition form on October 17, 1987.

Thereafter, Turner signed an agreement to be bound by a third successive bargaining agreement running from April 1, 1988, to March 31, 1991.[5] Toward the end of this agreement, on December 14, 1990, Local 669's business manager sent a letter to Triple A indicating the union's desire to negotiate another collective bargaining agreement effective April 1, 1991. The letter warned that if a renewal contract were not reached before March 31, 1991, then "lawful economic action" could ensue on or after April 1, 1991. The letter enclosed two copies of an "Assent and Interim Agreement" which would prohibit the signatories from negotiating a separate agreement with the Union and mandating that they observe the terms of the expired agreement until the

---

[5]The 1988-91 collective bargaining agreement contained a recognition clause which stated:

> Recognition: The National Fire Sprinkler Association, Inc. for and on behalf of its contractor members that have given written authorization and all other employing contractors becoming signatory hereto, recognize the Union as the sole and exclusive bargaining representative of all Journeyman Sprinkler Fitters and Apprentices in the employ of said Employers, who are engaged in all work as set forth in Article 18 of this Agreement with respect to wages, hours and other conditions of employment pursuant to Section 9(a) of the National Labor Relations Act.

effective date of a successor agreement.  Turner never signed this assent form.

During the early spring of 1991, Turner approached employees on a number of occasions to discuss both their employment with Triple A and general status with the union.  In early March, Turner approached employee Jack Moiren and told him that he would receive certain benefits if the company "went nonunion."[6]  Later that month, Danny Carpenter, Cecil P. "Shorty" Davidson, and Moiren had a long conversation with Turner and his son Steve on the front porch of Triple A.[7]  During the course of this discussion, Turner told Shorty that "no matter what happens you've got a job here for the same pay and you can pay half of your insurance."  Also that month, while visiting Carpenter's home, Turner stated that he would not sign the union agreement, but would in any event raise Carpenter's wage rate to the foreman level.[8]

On March 18, 1991, Phillips telephoned Turner to ask him if they could get together to discuss the negotiation of a renewal contract.[9]  Turner responded that he had business to attend to

---

[6]Specifically, Moiren testified before the administrative law judge that Turner promised him the equivalent of union wages, raises at the same time as union employees, and continued use of the company truck with gas paid.

[7]Danny Carpenter testified that he would occasionally drink beer with Turner.  He also testified that, on one occasion in late February or early March, Turner approached him, Moiren, and Philip Alan Thames while they stood on the front porch of Triple A and told them that, in the event that he did not sign the National Agreement, he would guarantee them a foreman's job, paid insurance, and a truck.

[8]In March, 1991, Alton Turner's son Steve Turner approached Thames and promised him continued employment at $14.00 per hour with paid insurance if the company "did not sign the contract."  In addition, Steve Turner alluded to the creation of a retirement or profit-sharing plan for the benefit of employees.

[9]Without Phillip's knowledge, Turner tape recorded this conversation.  The administrative law judge excluded a transcript of this and another conversation from evidence.  The appellant argues that these transcripts should not be excluded from evidence.  We have reviewed the excluded transcripts and cannot conclude that the exclusion affected any substantial rights of Triple A. The company apparently complains about the denial of some impeaching evidence which we do not find significant.  Thus, we need not address the legal issue raised by Triple A.

the following day in Atlanta and they set no date for a meeting. The following day, Phillips made a surprise visit to Triple A where he found Turner. Turner testified that the business trip to Atlanta had been canceled. Phillips asked Turner if he would sign the interim agreement and told him that he had a copy of it ready in his briefcase. Turner responded that he would not sign a "blank check" and informed Phillips that he was preparing a proposed contract to submit to the union. On March 21, Turner mailed Triple A's proposal for a complete contract to the union.

Also on March 21, Phillips wrote Turner expressing a need to "avert a work stoppage on April 1, 1991." In reference to their contacts on March 18 and 19, Phillips accused Turner of refusing to negotiate with the union. Although the union's March 1991 newsletter indicated that some employers would be struck, Phillips instructed Triple A employees to report to work on April 1. On March 26, Turner wrote to Phillips that strike replacements would be hired according to the terms of Triple A's proposed contract. On April 1, no strike occurred and union employees reported to work at Triple A.

On April 3, Phillips and Turner agreed to begin negotiations on April 9.[10] On April 9, the parties met to begin formal bargaining sessions at the Bradbury Inn in Mobile, Alabama. The union was represented by Clarence Radecker and Phillips. Triple A was represented by Turner and attorney Deborah H. Kehoe. At the meeting, Turner submitted a list of 23 jobs that it had bid on but

---

The other evidentiary issues raised by Triple A are without merit and warrant no discussion.

[10]On April 4, Turner wrote Phillips to confirm the meeting of April 9. This letter indicated that Turner had not received Local 669's counterproposal to Triple A's complete contract submitted in late March. Turner expressed an interest in having the union's counter-proposal sent to him by express mail so that he could review it before the April 9 meeting. On April 5, Phillips sent his own confirmation letter to Turner (apparently crossing Turner's letter in the mail). Phillips stated in this letter that he had some questions about Triple A's proposal and that he had some of his own contract proposals to add to negotiations on April 9.

lost in the past year when the bids were based on union wages and benefit cost levels. The notes of the meeting indicate that neither party really discussed these figures in much detail. The ALJ found that they did not talk long enough to indicate to the union that there was an economic emergency as the company asserts. The parties discussed Triple A's proposed contract and tentatively approved a limited number of provisions. The union promised that it would submit counter-proposals as to several provisions during future bargaining. Although the meeting lasted much of the day, the parties accomplished little and a second meeting was scheduled for April 30, 1991, the date suggested by Turner. Neither party mentioned any deadline for negotiation.

On April 12, 1991, Turner mailed a letter to the union accusing it of not "seriously address[ing]" the company's March 21, 1991, proposal. The letter asserted that since the union had failed to submit a "meaningful proposal to Triple A," they "[could] no longer tolerate [Local 669's] inaction." The company issued an ultimatum that would effectuate its proposed contract if no agreement was reached with the union prior to April 22, 1991. The letter indicated that Triple A was available to negotiate prior to this date, but firmly stated that changes would be implemented on April 22, 1991. Phillips received Triple A's demand on April 16, 1991. Phillips wrote to Triple A on April 17 confirming the April 30 meeting.[11] As of April 22, 1997, Triple A ceased making payments to the health, welfare, and pension funds as required by the expired collective bargaining agreement, and hired employees at wage rates different from those specified in the expired collective bargaining agreement.

At the second meeting on April 30, 1991, the parties made little progress on reaching an

---

[11]Before the administrative law judge, Phillips testified that he "didn't see any reason to change th[e] date" that the parties had formerly agreed upon to sit down and negotiate a new agreement. He didn't specifically respond to the letter sent by Triple A, because he thought Triple A was trying to "set me up for something that I didn't understand."

agreement. The union, represented by Billy Littleton, objected to Triple A's implementation of its proposal and informed the company that it actions constituted an unfair labor practice. Littleton told Turner and Kehoe that Local 669 and the company had a section 9(a) relationship which required Triple A to bargain with Local 669 concerning the terms and conditions of the expired collective bargaining agreement until the parties reached an impasse or negotiated a new agreement. Although Triple A stated that they were willing to bargain until a new agreement could be worked out, Littleton told Triple A that he was not prepared to bargain the next day.

## II. PROCEDURAL HISTORY

The Regional Director of Region 15 issued a complaint on September 27, 1991, alleging violations of sections 8(a)(1) and (5) of the National Labor Relations Act (the "Act"). 29 U.S.C. §§ 158(a)(1) and (5). On March 26, 1993, the ALJ issued a decision finding that the contract between Local 669 and Triple A was a section 8(f) prehire agreement and not a section 9(a) collective bargaining agreement. *Triple A Fire Protection,* 312 NLRB 1088, 1093-94, (1993), *supplemental decision* 315 NLRB 409, (1994). The General Counsel filed exceptions to this finding and the Board, on October 16, 1993, reversed this holding and determined that the agreement was a collective bargaining agreement under section 9(a) of the Act. *Triple A,* 312 NLRB at 1088-89. The Board stated that Triple A "voluntarily and unequivocally granted recognition to the Union as 9(a) representative." *Id.* at 1088. Relying on *Deklewa,* the Board found that the union's section 9(a) status mandated that the six month statute of limitations as codified in section 10(b) precluded an inquiry into Triple A's defense that the union never represented an uncoerced majority of Triple A's employees. *Id.* at 1089. Consistent with these findings, the Board remanded the case to the ALJ for further disposition.

In the supplemental decision of January 19, 1994, the ALJ found that Triple A violated

sections 8(a)(1) and (5) of the Act by bypassing the proper bargaining channels and dealing directly with employees, by unilaterally reducing wage rates for bargaining unit employees, and by unilaterally ceasing to make required fringe-benefit payments to established benefit plans. *Triple A Fire Protection,* 315 NLRB 409, 422 . In response to Triple A's asserted defenses, the ALJ noted the Board's ruling that section 10(b) barred Triple A's defense that the union never represented an uncoerced majority, and then the ALJ determined that the evidence did not support a finding that an impasse existed, that the union bargained in bad faith, that the union waived its right to bargain over changes, or that an economic hardship existed. *Id.* at 416-22. 29 U.S.C. § 160(b). On October 31, 1994, the Board affirmed the ALJ's findings and conclusions and adopted the order. *Id.* at 409. We address each of the above issues in turn.

### III. DISCUSSION

In reviewing a factual determination of the National Labor Relations Board, we analyze the totality of the record to determine whether the conclusion is supported by substantial evidence. *Northport Health Serv., Inc. v. NLRB,* 961 F.2d 1547, 1550 (11th Cir.1992). Substantial evidence constitutes more than a mere scintilla of evidence. *Id.* The Board's order may only be enforced if the record reflects "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)). Furthermore, the Board cannot ignore relevant evidence that detracts from its findings because such evasion detracts from a finding of substantial evidence. *Id.*

### A. CONVERSION OF THE SECTION 8(f) AGREEMENT INTO SECTION 9(a) STATUS

The Board found that the relationship between Local 669 and Triple A had been converted into full section 9(a) status by virtue of Triple A's October 1987 voluntary recognition of Local 669 as having been designated by a clear majority of Triple A's employees as their exclusive bargaining

representative. As noted above, Local 669 mailed the voluntary recognition form to Triple A with a cover letter calling attention to the then recent *Deklewa* decision. The letter also enclosed a list of Triple A's eight employees indicating that they were members of Local 669. The voluntary recognition form expressly and clearly called on Triple A to confirm "that a clear majority of ... [its employees] have designated, are members of, and are represented by ... [Local 669] ... for the purposes of collective bargaining." Because only eight employees were involved and because Triple A's owner himself, Turner, and his son Steve were among the eight, the Board could reasonably conclude that Turner would have actually verified and known that a clear majority of the employees had designated Local 669 as their exclusive bargaining representative, as called for by the form he signed.[12]

Indeed, Triple A does not in its brief on appeal challenge the Board's finding that the conversion to full section 9(a) status was achieved. Moreover, on these facts the NLRB has satisfied the *Deklewa* standard that a "voluntary recognition ... [be] based on a clear showing of majority support." *Deklewa,* 282 NLRB at 1387 n. 53. *See MFP Fire Protection, Inc. v. NLRB,* 101 F.3d 1341, 1343 (10th Cir.1996). Having established its full section 9(a) status, it follows that Local 669 was entitled to a presumption of majority support upon the expiration of the collective bargaining agreement at the end of March 1991. Similarly, both parties had a duty to bargain in good faith, and

---

[12]Some of the Board's decisions following *Deklewa* seem to suggest that the Board might be applying a kind of estoppel doctrine, so that an employer that voluntarily recognizes a union based solely on the union's assertion of majority status is thereafter limited in its freedom to repudiate same, even though the employer did not actually verify the majority status at the time. *See Hayman Electric,* 314 NLRB 879, 887 n. 8. As indicated in the text, the case before us is much easier, involving as it does very strong evidence that Local 669 enjoyed majority status at the time, and that Turner knew that. For this reason, and because Triple A has not challenged the majority status (except for its coercion claim), we need not address an estoppel type theory.

Triple A had a duty not to deal directly or make unilateral changes in violation of section 8(a)(5).[13]

B. TRIPLE A's VIOLATIONS OF SECTIONS 8(a)(1) and (5)

### 1. Direct Dealing

Section 8(a)(5) creates an obligation on the part of the employer to bargain with the incumbent union as the exclusive bargaining representative of its employees. "[T]he employer's statutory obligation is to deal with the employees through the union, and not with the union through the employees." *General Electric Company,* 150 NLRB 192 (1964). The repeated efforts of Turner and his son Steve to deal directly with employees outside the normal channels of collective bargaining are amply supported in the record. On a number of occasions, Turner attempted to dissuade employees from supporting the union and create incentives for them to abandon their support for the union. These actions are *per se* violations of sections 8(a)(1) and (5) of the National Labor Relations Act. *Medo Photo Supply Corp. v. NLRB,* 321 U.S. 678, 684-88, 64 S.Ct. 830, 833-35, 88 L.Ed. 1007 (1944); *Cagle's Inc. v. NLRB,* 588 F.2d 943, 948 (5th Cir.1979). Therefore, we enforce the Board's order concerning these violations.

### 2. Unilateral Changes

The Board has taken the position that allowing employers to make unilateral changes in the terms and conditions of employment which are subject to negotiation would decrease the ability of parties to bargain effectively. *Litton Financial Printing, Div. v. NLRB,* 501 U.S. 190, 198, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991). As the Supreme Court determined in *NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962), "[a] refusal to negotiate *in fact* as to any subject which is within § 8(d), and about which the union seeks to negotiate, violates § 8(a)(5)

---

[13]Consistent with Triple A's failure to argue that there was no conversion to full section 9(a) status, Triple A does not argue that there was merely a section 8(f) relationship, and thus upon expiration of the agreement, Triple A had no duty to bargain or other obligations to Local 669.

though the employer has every desire to reach agreement with the union upon an over-all collective agreement and earnestly and in all good faith bargains to that end." Therefore, "an employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." *Litton,* 501 U.S. at 198, 111 S.Ct. at 2221 (citing *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962)).

In this case, the Board adopted the ALJ's findings that Triple A violated sections 8(a)(5) and (1) of the Act by ceasing to make contributions to the pension and benefit funds. The record supports this finding. On April 9, Local 669 and Triple A met for the first formal bargaining session following the expiration of the collective bargaining agreement. The parties read over Triple A's proposed contract and Local 669 submitted its own minor suggestions. At this meeting, Triple A submitted to Local 669 a list of 23 jobs that it had bid for in the last year and not received, allegedly due to the union wage and benefit levels. Although the parties met for much of the day, excluding breaks and lunch, they made little progress, but agreed to meet again in about three weeks, on April 30.

Three days later, the employer sent the union a letter indicating that it would stop making payments to the employee pension and health funds on April 22. The union representative received the letter on April 16 and responded merely by affirming the April 30, 1991, meeting. On April 22, 1991, the employer ceased funding the plans. Similarly, the employer admitted in its answer that following April 21, 1991, employees were hired at wage rates not specified in the expired collective bargaining agreement. At the meeting on April 30, 1991, the union representative objected to the employer's unilateral implementation of its own plan. We find that this evidence substantially supports the findings reached in the Board's order.

C. TRIPLE A'S DEFENSE: THE MAJORITY WAS COERCED.

Triple A's first defense is that Local 669 never represented an uncoerced majority of its employees because the 1988-91 National Agreement discriminated in favor of union members, and thus was coercive. The gist of Triple A's argument is that various provisions in the collective bargaining agreements which the parties have signed over the years (and in the union constitution) discriminate in favor of union membership, and thus the union majority which existed at the time of the October 1987 voluntary recognition was a coerced majority. The Board did not address the merits of this challenge to Local 669's majority status, because it found that section 10(b) and the Board's *Deklewa* decision foreclosed this defense. 29 U.S.C. § 160(b).

It has long been recognized that section 10(b) prohibits employers from waiting more than six months to attack the majority status of union representation at the time of recognition.[14] In 1960, the Supreme Court so held in *Local Lodge No. 1424 (Bryan Mfg. Co.) v. NLRB,* 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). There, a union and an employer had entered into a collective bargaining agreement containing a "union security" clause at a time when the union lacked majority status. A "union security" clause required all employees to become and remain members of the union. It was an unfair labor practice to enter into such an agreement if at the time of execution the union did not represent a majority of the employees. Ten months later, the employees filed an unfair labor practice charge, alleging the union's lack of majority status at the time of execution and the consequent illegality of the continued enforcement of the agreement. The Supreme Court held that, although an unfair labor practice occurred at the time of the illegal recognition, the six-month

---

[14]*See NLRB v. Viola Industries-Elevator Div.,* 979 F.2d 1384, 1387 (10th Cir.1992); *Brower's Moving & Storage, Inc.,* 297 NLRB 207, 209 n. 11, ("[A]n employer may not defend against a refusal-to-bargain allegation on the basis that the original recognition, occurring more than 6 months before charges have been filed in the proceeding raising the issue, was unlawful. Any such defense is barred by Section 10(b) of the Act.") (quoting *Morse Shoe, Inc.,* 227 NLRB 391, 394).

limitations proviso of section 10(b) barred the unfair labor practice complaint. *Accord Daisy's Originals, Inc. of Miami v. NLRB,* 468 F.2d 493, 501 (5th Cir.1972) (citing *International Assoc. of Machinists, AFL-CIO (Bryan Mfg. Co.) v. NLRB,* 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960)).

In this case, the Board held that its decision in *Deklewa* had established that unions in the construction industry which had achieved full section 9(a) recognition should not have less favored status than unions outside the construction industry. Thus, the Board held that the six-month limitations period of section 10(b) was applicable and that a challenge to a union's majority status would not be entertained after a lapse of more than six months. We hold that the Board's interpretation is reasonable. As discussed above, the relationship between Local 669 and Triple A in this case was converted to full section 9(a) status by the October 1987, voluntary recognition. Under *Deklewa,* Local 669 thus enjoyed section 9(a) status, just as any other union outside the construction industry. *Deklewa,* 282 NLRB at 1387 n. 53. We find nothing unreasonable in the Board's conclusion in *Deklewa* and in the instant case; after achieving full section 9(a) status, Local 669 was entitled to full membership in section 9(a) status, including the application of section 10(b).

Applying section 10(b) to the facts of the instant case, the Board declined to entertain the merits of Triple A's challenge to Local 669's majority status because Triple A waited almost four years after the October 1987 voluntary recognition to object. We find no error in the Board's application of the section 10(b) bar to the facts of this case.[15] *Accord MFP Fire Protection, supra,*

---

[15]Section 10(b) bars Triple A's challenge to the majority status of Local 669 *as of October 1987.* We note, however, that section 10(b) does not leave a company without other remedies if a union no longer enjoys majority status. For example, one treatise states:

> An employer may withdraw recognition from an incumbant union at any time when such withdrawal is not precluded by law, if it can affirmatively establish either (1) that the union no longer enjoyed majority status when recognition was withdrawn, or (2) that the withdrawal was predicated on a reasonably grounded doubt as to the union's continued majority status, which doubt was asserted in

at 1343; *see also NLRB v. Viola Industries-Elevator Div., Inc.,* 979 F.2d 1384, 1387 (10th Cir.1992).

After applying section 10(b) pursuant to the *Deklewa* mandate that unions in the construction industry which had achieved full section 9(a) status should not have less favored status than unions outside the construction industry, the Board in the instant case cited *Casale Industries,* 311 NLRB 951. Like the Board in the instant case, its decision in *Casale* also relied upon *Deklewa* as authority for applying section 10(b) in an analogous situation. Triple A observes that *Casale* was decided after the relevant events in this case. Therefore, Triple A argues, *Casale* should not be applied retroactively. We reject Triple A's argument. As indicated above, the controlling authority relied upon by the Board in the instant case was *Deklewa,* which predated the relevant events in this case. Because *Deklewa* established that unions in the construction industry which had achieved full section 9(a) status should not have less favored status than unions outside the construction industry, it follows that the six-month limitation period of section 10(b) would be applicable. There is no retroactivity problem.[16]

D. TRIPLE A's OTHER DEFENSES

As the administrative law judge noted, an employer may rebut a showing that unilateral changes were made by asserting the existence of certain affirmative defenses, notably that the parties reached an impasse, delay or bad faith by the union, and economic hardship.

---

good faith, based upon objective considerations, and raised in a context free of employer unfair labor practices.

1 The Developing Labor Law 571 (Patrick Hardin et al. eds., 3rd ed.1992) (footnote omitted). In the instant case, Triple A makes no such argument.

[16]*Deklewa* was decided on February 20, 1987, before the relevant events in this case. Thus, Triple A's discussion of cases questioning the retroactivity of *Deklewa* is not relevant to this case.

Triple A argues in its defense that the negotiations had reached an impasse at the time it made its unilateral changes. As this court has stated, an "[i]mpasse is a deadlock in negotiations and presupposes [good faith] negotiations." *Electric Machinery Co. v. NLRB,* 653 F.2d 958, 963 (5th Cir.1981).[17] The determination of impasse involves an inquiry into "a myriad of circumstances," including (1) the background and relationship of the parties, (2) their willingness to negotiate, (3) the extent and frequency of bargaining, (4) the integrity of the bargaining, and (5) the good or bad faith of the parties. *Id.* at 963 n. 5.

At the point Triple A decided to institute its unilateral changes, there had been only one formal session to discuss the respective positions of the parties. The negotiations were still in a stage of exploration, as both sides were still reading and considering the positions of the other party. Triple A did not even have possession of a full union proposal for its consideration. Although Triple A argues that the union's failure to submit a full-length proposal at this early point in the bargaining process indicated their bad faith, and a "take-it-or-leave-it" approach, the union had submitted counter-proposals at the April 9 meeting and had specifically agreed to continue negotiations in the future. When Triple A mailed the letter to the union on April 12 indicating that it was going to make unilateral changes, and when it actually made such changes on April 22, the parties had already agreed to a bargaining session later in the month. We readily conclude that there is substantial evidence in the record as a whole to support the finding that the parties had not reached an impasse in bargaining.[18]

---

[17]In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

[18]Triple A also argues in defense of the unfair labor charges that Local 669's bad faith justified its unilateral changes. The company asserts that, from the beginning of negotiations, the union had absolutely no intention of entering into an agreement separate from the National

Triple A argues that, in the event that this court finds that an impasse did not exist at the time unilateral changes were made, an exception to the rule of impasse applies in this case. Triple A asserts that when, upon expiration of a collective bargaining agreement, the union unreasonably delays or stalls the bargaining process, the employer may make unilateral changes without bargaining to impasse if it first notifies the union of its intent to make these changes. *See NLRB v. Pinkston-Hollar Construction Services, Inc.,* 954 F.2d 306, 311 (5th Cir.1992).

Triple A contends that *Pinkston-Hollar* supports its argument that a waiver of rights occurred. However, the facts of *Pinkston-Hollar* are very different from those of the instant case. In *Pinkston-Hollar,* the employer and the union had conducted months of formal bargaining sessions. Finally, after informing the union of its interest in considering a new benefits package, and after several unsuccessful attempts to get a copy of the existing union benefits package, the employer informed the union that it intended to cease participation in the union plan and substitute its own plan effective some forty days hence, and invited the union to bargain over the matter. In two intervening bargaining sessions, the union declined to bargain over the issue. When reminded

Agreement negotiated with the multi-employer collective bargaining unit. The union simply expected Triple A to sign onto the National Agreement as it had on three previous occasions. In support of its allegation of bad faith, Triple A produced evidence of Phillips's behavior at the April 9 meeting, the union's failure to bring a comprehensive counter-proposal to the first meeting, and the union's history of relying upon the National Agreement. The company also argues that the union representatives simply read aloud the company proposal at the April 9 negotiating session.

At the initial April 9 meeting, the union examined the employer's proposal and displayed a willingness to extract all references from its own counter-proposals to the multi-employer bargaining unit. Furthermore, while Phillips himself had never negotiated an agreement separate from the National Agreement, he testified that Local 669 had negotiated agreements separate from the National Agreement. While the record contains conflicting evidence (with inferences of bad faith on the part of both parties), we cannot conclude that the ALJ's finding is without substantial support in the record. Accordingly, we reject Triple A's bad faith defense.

that the company planned to implement the change, the union made no request for a postponement. The ALJ found that the union failed to act with due diligence. Assuming *arguendo* that the *Pinkston-Hollar* rule is applicable in this circuit, we find that the facts of this case are clearly insufficient to justify an exception to the general duty to bargain to impasse.

Here, the negotiations had barely begun. Local 669 was not found guilty of delay, and in fact there was only minimal delay before Triple A instituted unilateral changes. Moreover, Triple A's April 12, 1991, ultimatum was not comparable to the *Pinkston-Hollar* notice. Triple A's letter gave only ten day's advance notice, and only six days from Local 669's receipt. Moreover, the April 30 negotiation session had already been scheduled before the unilateral changes were announced.

We return next to Triple A's waiver argument. In concluding that the union did not waive its statutory right to bargain over any terms and conditions of employment, the administrative law judge relied on the Board's decision in *Bottom Line Enterprises,* 302 NLRB 373, In *Bottom Line,* the Board noted that "when ... the parties are engaged in negotiations, an employer's obligation to refrain from unilateral changes extends beyond the mere duty to give notice and an opportunity to bargain; it encompasses a duty to refrain from implementation at all, unless and until an overall impasse has been reached on bargaining for the agreement as a whole." *Id.* at 374. *Bottom Line* recognized two exceptions to this general rule: when a union delays the process of bargaining and when "economic exigencies compel prompt action." *Id.* Under the circumstances here—after meeting for the first time on April 9 and, at that meeting, establishing a date to meet for a second discussion—substantial evidence supports the finding that the union intended to continue negotiations and did not lack due diligence in bargaining. We find that there is no merit to the employer's argument that the union waived its right to bargain.

Finally, we find no merit to Triple A's contention that its economic situation justified the

unfair labor practices. A situation of economic necessity requires either a showing of "extenuating circumstances" or a "compelling business justification" that is not present here. *Winn-Dixie Stores,* 243 NLRB 972, 974 n. 9. The mere assertion that the company lacks the financial ability to make the required fringe benefit payments does not justify these unilateral changes. *Stevens & Assoc. Constr. Co.,* 307 NLRB 1403, 1403 . The fact that Turner submitted a list of 23 jobs that he had bid for and lost in the past year did not establish that the company was in grave economic difficulty. Indeed, the parties did not even discuss the issue at the April 9 meeting. The employer clearly did not satisfy its burden and establish that its economic situation warranted a unilateral change in the terms and conditions of employment.

## IV. CONCLUSION

In the instant case we find substantial evidence to support the Board's conclusion that Triple A violated sections 8(a)(1) and (5) of the Act by directly dealing with employees outside the bargaining process, by unilaterally ceasing to make payments to the fringe benefit plans, and by unilaterally reducing the wage rates for bargaining unit employees. We find no error in the Board's decision applying section 10(b) and declining to address the merits of Triple A's coerced majority defense. We also find no merit to the employer's defenses regarding impasse, bad faith, or economic necessity.

The Board's order is ENFORCED.