**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 25-10103
Non-Argument Calendar

————————————

SOUTHWEST FLORIDA SYMPHONY ORCHESTRA AND
CHORUS ASSOCIATION, INC.,

*Petitioner-Cross Respondent,*

*versus*

NATIONAL LABOR RELATIONS BOARD,

*Respondent-Cross Petitioner,*

AMERICAN FEDERATION OF MUSICIANS, LOCAL 427-721,
AFL-CIO,

*Intervenor.*

————————————

Petitions for Review of a Decision of the
National Labor Relations Board
Agency No. 12-CA-278936

————————————

Before ROSENBAUM, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

The Southwest Florida Symphony Orchestra and Chorus Association, Inc. ("Symphony"), petitions for review of an order of the National Labor Relations Board ("NLRB" or "Board"), which held, contrary to the conclusion of an administrative law judge ("ALJ"), that the Symphony violated the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 8(a)(5) & (1), by prematurely declaring impasse during negotiations with the union and unilaterally implementing the union's last offer.

The Symphony maintains that the Board exceeded its authority by reversing the ALJ's findings and credibility determinations, and that the Board's decision is speculative and not supported by substantial evidence. The Board cross-petitions for enforcement, and the American Federation of Musicians, Local 427-721, AFL-CIO ("Union"), intervenes in support of the decision. After careful review, we deny the Symphony's petition and grant the Board's cross-petition.

## I.

The Symphony was a non-profit symphony orchestra in Fort Myers, Florida. And the Union has represented its musicians in collective bargaining with the Symphony since 2008.[1] As relevant here, in September 2019, the parties began negotiations over

---

[1] The Symphony advised in its briefing that it would be "closing its doors permanently on June 30, 2025," after more than 60 years in operation.

a successor collective bargaining agreement to an agreement that was in effect from October 1, 2017, through September 30, 2019.

The relevant facts are largely undisputed. The parties participated in fourteen bargaining sessions over a one-year period, some of which were virtual. They also engaged the help of a federal mediator in December 2019. Midway through the negotiations, the COVID-19 pandemic caused the Symphony to alter its bargaining proposals significantly. Then, on July 23, 2020, after additional bargaining sessions, the Symphony presented what it called its "last, best, and final offer." We call this offer the "July LBF offer."

After surveying bargaining-unit members about the July LBF offer, the Union submitted a counterproposal on August 14, 2020, and negotiations continued. The parties continued to exchange proposals and to meet leading up to a bargaining session on September 30, 2020, which saw the parties reach agreement or move closer on some issues. At the end of meeting, the Symphony orally informed the Union that its latest proposal was now its last, best, and final offer (the "September LBF offer"), and that it would not move further on contract terms. At the Symphony's request, the Union took the proposal to its members, who voted against ratification in mid-October 2020.

In a telephone call on October 19, 2020, the Union informed the Symphony of the vote results and that it intended to survey its members about their reasons for rejecting the agreement. But a week later, the Symphony sent a letter to the Union declaring

impasse and stating its intent to implement its last offer from September 30. The October 26 letter advised, "If you believe you have a proposal that would substantively alter the parties' current positions, we remain willing to review and consider your proposal as part of our commitment to bargain in good faith."

The Union responded the next day that it "strenuously disagree[d]" that the parties were at impasse, and that further bargaining would not be futile. The Union proposed that the failed vote should "act as a spur to the [Symphony] to re-examine its positions on the key unresolved issues and should actually move us closer to an agreement." The Symphony began hiring in November for its December 2020 performances under the terms of its last offer to the Union.

## II.

The Union filed unfair-labor-practice charges against the Symphony, and the NLRB's General Counsel filed an amended consolidated complaint against the Symphony in September 2021. The General Counsel alleged that the Symphony violated § 8(a)(5) and (1) of the NLRA by prematurely declaring impasses in negotiations for a successor contract and unilaterally implementing its last bargaining proposal.

### A.

Over a two-day hearing in December 2021, the ALJ heard testimony from three witnesses: Jane Owen, a negotiator for the Union; Richard Sparrow, the Union's secretary and treasurer; and (c) Michael Willats, a negotiator for the Symphony. The ALJ also

received in evidence various correspondence between the parties during the negotiations.

Following the hearing, the ALJ issued an order concluding that impasse existed on October 26, 2020, and that the Symphony did not violate § 8(a)(5) and (1).  The ALJ noted that that the only relevant facts genuinely in dispute related to the content of the phone call on October 19, 2020, among Owen, Sparrow, Willats, and Amy Ginsburg, the Symphony's Executive Director, and whether "Owen asked for a meeting on November 6, 2020."  The ALJ "decline[d] to credit [Owen's] testimony that she asked to resume bargaining for a contract after November 6 or said anything about the Union coming up with a new proposal," citing contrary testimony from Willats, which "was sufficient to put the matter in doubt."  Nonetheless, the ALJ reasoned that, even if the request occurred, it did not defeat the Symphony's claim of impasse because it was a "vague request . . . unaccompanied by an indication of the areas in which [the Union] fores[aw] future concession."

Turning to the question of impasse, the ALJ reviewed the NLRB's "pivotal case" on impasse, *Taft Broad. Co.*, 163 NLRB 475, 478 (1967).  *Taft* explains that whether impasse exists is a "matter of judgment" based on the totality of the circumstances, including the parties' bargaining history and good faith, the length of negotiations, the importance of the unresolved issues, and the contemporaneous understanding of the parties as to the state of the negotiations.  *Id.*

In the ALJ's view, the key question was whether, as of October 26, "there was objectively any room for movement." In finding that "there was not," the ALJ noted that "[a]t no time between September 30 and October 26[] did the Union suggest it would make changes to its last proposal." Rather, the ALJ noted, the Union simply suggested that the Symphony should reconsider its positions on the unresolved issues. The ALJ outlined numerous "key unresolved issues" as of September 30.

## B.

The matter was transferred to a proceeding before the Board following the ALJ's ruling. The General Counsel and the Union filed exceptions to the ALJ's decision, and the parties submitted additional briefing.

On December 16, 2024, a three-member panel of the Board concluded, contrary to the ALJ's decision, that the Symphony violated § 8(a)(5) and (1) of the Act by prematurely declaring impasse and unilaterally implementing its last offer. The Board first addressed the parties' factual dispute about what was said during the October 19 phone call. The Board stated that it was not "disturbing the judge's credibility determinations," which it "assume[d] arguendo to be correct." In particular, the Board accepted "the judge's rejection of Owen's testimony that, on the call, she affirmatively sought a meeting with the [Symphony] to resume bargaining after November 6."

But the Board reasoned that "additional factual findings [were] warranted" in light of "testimony that the judge did not

address in his decision," including Sparrow's related testimony about the October 19 call. Sparrow testified that Owen expressed the Union's willingness to meet again with the Respondent after the conclusion of the mediator's medical leave on November 6. The Board did not view this testimony as in conflict with testimony from Willats, "who only asserted that there was no request for a meeting." Because Sparrow's testimony "ha[d] not been discredited by the judge" or challenged by other evidence, the Board found "that on the October 19 call Owen at least conveyed a willingness to meet with the Respondent after November 6."

The Board further noted that the ALJ failed to address Willats's own testimony that, during the October 19 call, Owen informed him that the Union intended to survey its membership to determine the reasons they voted down the Symphony's contract proposal. Thus, the Board found that "even if Owen did not mention providing new proposals on the October 19 call . . . , Willats' testimony supports finding that Owen did state that the Union planned to survey the membership in an effort to determine why they voted down" the Symphony's offer.

The Board reiterated that it was not "disturbing the judge's credibility determinations." But it found, "based on record evidence not addressed by the judge, that, during the October 19 call, Owen at least said she was open to meeting again after November 6 and that she intended to survey the Union membership to determine why they had rejected" the Symphony's September LBF offer.

Turning to the question of impasse, the Board reviewed the ALJ's reasoning and the *Taft* factors and noted that it was the Symphony's burden to establish impasse. The Board ultimately concluded that the Symphony had fallen short of proving that the "Union was unwilling to explore further options or was at the end of its rope."

The Board rested its conclusion on several factors. First, the Board found that the parties had made progress on major issues, involving "concessions by both parties," following the Symphony's July LBF offer, including during the last bargaining session on September 30.

Next, the Board reasoned that, given its additional findings about the October 19 call, Owen's stated openness to continue negotiations after surveying the membership supported an inference that the Union "could reasonably be expected to make new proposals, as it did previously, if given the chance." The Board observed that the prior survey had generated new proposals from the Union and moved the negotiations forward, prompting the Symphony to "make movement of its own from its July LBFO," and that it was reasonable for the Union to survey its membership before crafting any counterproposal. While the Board acknowledged it was unknown whether a survey would have "move[d] the needle on bargaining," it reasoned that the "bargaining history related to the July LBFO indicates that there was a reasonable prospect of such a result."

The Board also stated that the Union's October 27 letter, in response to the Symphony's declaration of impasse, did not "rule out the possibility of further progress spurred by the Union's proposals." The Board reasoned that, given the parties' bargaining history, the letter "might reasonably be viewed" as expressing "optimism concerning future progress based on the back-and-forth that had previously moved the [Symphony] off its earlier last, best, and final offer."

Besides that, the Board noted that the failed ratification vote did not on its own show impasse because the context reflected that "the failed vote here did not forebode any lapse in meaningful negotiations." The Board also rejected the view that the Union was required "to make substantial new proposals to avert impasse," since the "factual backdrop raise[d] a reasonable inference that future sessions will yield progress" following a survey of Union membership.

In summary, the Board concluded that the Symphony "declared impasse despite both recent progress at the table and, critically, the Union's stated intention to survey its members regarding their reasons for rejecting the Respondent's September 30 LBFO—where previously a membership survey following a last, best, and final offer had been a harbinger of new Union proposals." Because "the Union's conduct suggest[ed] a genuine possibility of continued productive bargaining," the Board concluded that the Symphony's "October 26 declaration of impasse was premature" and that it violated § 8(a)(5) and (1) of the NLRA by implementing its

last offer unilaterally.  The Board ordered various remedies, which are not directly at issue in this appeal.

The Symphony now petitions this Court for review of the Board's decision, asserting that the Board acted outside its authority by making its own credibility findings relating to the October 19 call and contradicting the ALJ, and that the Board's findings and inferences lack substantial evidence in the record.  The Board cross-applies for enforcement of its order, and the Union intervenes in support of the Board's decision.

### III.

We review the Board's factual findings "to ensure that they are supported by substantial evidence on the record as a whole." *NLRB v. Contemporary Cars, Inc.*, 667 F.3d 1364, 1370 (11th Cir. 2012); *see* 29 U.S.C. § 160(e), (f).  Substantial evidence is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *NLRB v. Triple A Fire Prot., Inc.*, 136 F.3d 727, 734 (11th Cir. 1998) (quotation marks omitted).  "So long as the Board has made a plausible inference from the record evidence, we will not overturn its determinations, even if we would have made different findings upon a *de novo* review of the evidence."  *Cooper/T. Smith, Inc. v. NLRB*, 177 F.3d 1259, 1262 (11th Cir. 1999).

The substantial evidence standard "encompasses the requirement that the Board, as adjudicator, engage in reasoned decisionmaking."  *NLRB v. Gimrock Constr., Inc.*, 247 F.3d 1307, 1309 (11th Cir. 2001).  That is, the Board's process in reaching its decision

must be "logical and rational." *Id.* Thus, "[w]hile the Board may reject the ALJ's factual inferences, the Board has an independent obligation to explain clearly its reasons for doing so." *Id.* at 1312 (citation omitted). "When the Board misconstrues or fails to consider important evidence, its conclusions are less likely to rest upon substantial evidence." *Cooper/T. Smith*, 177 F.3d at 1263 (quotation marks omitted).

## IV.

The Symphony challenges the Board's decision on procedural and substantive grounds. We start with the procedural objections before turning to the substantive issue of "impasse."

## A.

The Symphony first contends that the Board exceeded its authority under 29 C.F.R. § 102.46 by considering the General Counsel's and the Union's procedurally "deficient" exceptions to the ALJ's decision. We disagree.

Section 102.46 outlines requirements for filing exceptions to an ALJ's decision before the Board, and states that noncompliant exceptions "may be disregarded." 29 C.F.R. § 102.46(a)(2)(ii). By its terms, the regulation gives the Board discretion with respect to the sufficiency of parties' exceptions. *See Biden v. Texas*, 597 U.S. 785, 802 (2022) ("This Court has repeatedly observed that the word 'may' clearly connotes discretion.") (quotation marks omitted). Here, the Board reasonably declined to disregard the Board's and Union's exceptions because "the exceptions and briefs together sufficiently designate the parties' points of disagreement with the

judge's decision."   Although the Symphony suggests we should substitute our own judgment for that of the Board and deem the exceptions waived, it fails to show that the Board acted outside its discretionary authority.

## B.

Next, the Symphony argues that we should not defer to the Board's decision, as we usually would, because the Board "supplant[ed]" the ALJ's credibility determinations without a reasoned explanation grounded in the record.  The Symphony bases this argument primarily on the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, which held that courts should not defer to agency interpretations of ambiguous statutory language.  603 U.S. 369, 413 (2024).

The Symphony fails to show how *Loper Bright* is relevant to this case.  The Board's decision did not rely on an interpretation of statutory language or a question of law.  Rather, the Board determined that the parties were not at impasse when the Symphony declared it.  And that's a "question of fact peculiarly suited to the Board's expertise."  *NLRB v. J. H. Bonck Co.*, 424 F.2d 634, 638 (5th Cir. 1970).[2]

We have rejected the view that our standard of review changes "when the Board reaches a conclusion different from that

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), we adopted as binding precedent all decisions of the former Fifth Circuit handed down by the end of close of business on September 30, 1981.

of the administrative law judge." *NLRB v. Allied Med. Transp., Inc.*, 805 F.3d 1000, 1005 (11th Cir. 2015). While the ALJ's conclusions are relevant to determining whether the substantial-evidence standard has been satisfied, *id.*, the Board maintains the authority to differ with the IJ on "inferences and conclusions to be drawn from the facts," *Nix v. NLRB*, 418 F.2d 1001, 1008 (5th Cir. 1969). To be sure, the Board may not simply "reverse the ALJ's credibility findings." *Gimrock Constr.*, 247 F.3d at 1310–11 ("An ALJ is in a better position than the Board to make credibility findings."). But when "the ALJ's credibility determinations could reasonably yield both the Board's inference and the ALJ's conflicting inference," the Board may reverse the ALJ's findings as to "overarching, quasi-legal inferences from facts." *Id.* at 1311.

Accordingly, we hold that the ordinary substantial-evidence standard applies to our review of the Board's decision. *See Allied Med. Transp.*, 805 F.3d at 1005. But we will consider the ALJ's decision, among other factors, in determining whether substantial evidence supported the Board's decision.

## C.

On the issue of impasse, the Symphony maintains that substantial evidence does not support the Board's decision. In the Symphony's view, the record evidence established only "a theoretical and vague possibility that the Union would be willing to meet in the future and that the Union would survey its members to determine why it voted down the proposal." That "vague possibility of a further meeting," according to the Symphony, was not enough

to forestall impasse, particularly when other factors favored a finding of impasse.

"[A]n employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." *Triple A Fire Prot.*, 136 F.3d at 736. "Impasse" is "synonymous with a deadlock; the parties have discussed a subject or subjects in good faith, and despite their best efforts to achieve agreement with respect to such, neither party is willing to move from its respective position." *Elec. Machinery Co. v. NLRB*, 653 F.2d 958, 963 (5th Cir. Aug. 1981).

It's well established that "the determination of whether the parties to negotiations have reached an impasse is a question of fact peculiarly suited to the Board's expertise." *J. H. Bonck*, 424 F.2d at 638. Whether impasse existed depends on "a myriad of circumstances," including the background and relationship of the parties, the good or bad faith of the parties, the extent and frequency of bargaining, the importance of the disputed issues, and the contemporaneous understanding of the parties as to the state of negotiations. *Triple A Fire Prot.*, 136 F.3d at 738; *see Elec. Mach.*, 653 F.2d at 963 n.5; *Taft Broad.*, 163 NLRB at 478.

Here, substantial evidence supports the Board's conclusion that the Symphony prematurely declared impasse and that it violated § 8(a)(5) and (1) of the NLRA by implementing its last offer unilaterally. To start, the Board's "additional factual findings" about the October 19 phone call did not supplant or disregard the ALJ's credibility determinations and factual findings, as the

Symphony maintains.  The record shows that the Board thoroughly reviewed the ALJ's findings about what was said during the October 19 phone call, plus the underlying testimony.  Then, without disturbing those findings, the Board made reasonable additional findings based on testimony that was not addressed by the ALJ or otherwise contradicted.

As the Board noted, the ALJ declined to credit Owen's "testimony that she asked to resume bargaining for a contract after November 6 or said anything about the Union coming up with a new proposal," citing Willats's contrary testimony on that point.  But the ALJ did not address testimony about the October 19 call from Sparrow, who testified that Owen indicated more generally that the Union "would be open to getting together again after the mediator was done with her medical leave" in November.  And it's undisputed that Owen informed Willats that the Union intended to survey its membership about why the vote failed.  Such a survey, just a few months earlier, had spurred progress in negotiations following the Symphony's July LBF offer.

Thus, the Board reasonably found that, even assuming the ALJ was correct that Owen did not "affirmatively request[] further bargaining on the October 19 call or state[] that she planned to submit proposals," she nonetheless "indicated that she was open to meeting" in the future and planned to survey the Union membership about their reasons for voting down the September LBF offer. *See Gimrock Constr.*, 247 F.3d at 1310–11.  While the Symphony objects to the Board's additional findings, it does not identify any

specific conflict between those findings and the ALJ's findings with respect to the October 19 call. Rather, the Symphony mischaracterizes the Board's findings.[3]

Even so, the Symphony acknowledges that the additional findings are supported by record evidence, even if it disputes the broader inferences drawn by the Board. Because the Board's additional findings about the content of the October 19 phone call are supported by the record and consistent with the ALJ's credibility determinations, we see no cause to overturn them.

Turning to the broader question of "impasse," the Board was free to differ from the ALJ as to the "inferences and conclusion to be drawn from the facts," *Nix*, 418 F.2d at 1008, so long as the Board "clearly explain[ed] its reasons for doing so" and relied on substantial evidence, *Gimrock Constr.*, 247 F.3d at 1309. The Board met both standards here.

Following a thorough review of the ALJ's decision and the underlying evidence, the Board concluded that the Symphony had fallen short of proving that the "Union was unwilling to explore further options or was at the end of its rope" as of October 26, when the Symphony declared impasse. Looking to the history of the parties' negotiations, the Board found that the parties had made progress on major issues, involving "concessions by both parties,"

---

[3] The Symphony incorrectly claims that "[t]he primary additional 'factual' finding made by the Board in its Opinion is that 'Owen affirmatively requested further bargaining on the October 19 call.'"

following the Symphony's prior "last, best, and final" offer in July 2020, including during the last bargaining session on September 30. The Symphony does not appear to dispute the Board's assessment on this point.

The Board further reasoned that, given its additional findings about the October 19 phone call, Owen's stated openness to continue negotiations after surveying Union membership supported an inference that the Union "could reasonably be expected to make new proposals, as it did previously, if given the chance." As the Board observed, the prior survey had generated new proposals from the Union, prompting the Symphony to "make movement of its own from its July LBFO" and moving negotiations forward. So despite the failed ratification vote of the September LBF offer, it was plausible for the Board to infer that the Union was still willing to move in negotiations and, after surveying its membership, engage in the kind of "back-and-forth that had previously moved the [Symphony] off its earlier last, best, and final offer."

The Symphony maintains that the prospect of future bargaining movement was too remote and speculative to forestall impasse. *See, e.g., Dish Network Corp. v. NLRB*, 953 F.3d 370, 378 (5th Cir. 2020) ("The bare possibility that something might have clicked during later negotiations does not offer any support for the Board's finding."); *see Triple A Fire Prot.*, 136 F.3d at 734 (stating that substantial evidence is "more than a mere scintilla"). But whether the parties to negotiations have reached an impasse is a fact-specific

inquiry "peculiarly suited to the Board's expertise." *J. H. Bonck,* 424 F.2d at 638.

Even if we would have made different findings upon a de novo review of the evidence, the Board made plausible inferences from the record and clearly explained its reasons for disagreeing with the ALJ's assessment of whether the parties were at impasse. *See Gimrock Constr.*, 247 F.3d at 1309; *Cooper/T. Smith*, 177 F.3d at 1262. The facts here plausibly show more than the vague possibility of future progress. Indeed, the parties' recent history of bargaining progress, in response to a membership survey about the July LBF offer, supports the Board's inference that "future sessions w[ould] yield progress" once the Union again surveyed its members about the September LBF offer.

## V.

For these reasons, substantial evidence supports the Board's findings that the Symphony's declaration of impasse was premature, and that it violated § 8(a)(5) and (1) of the NLRA as a result. We therefore **DENY** the Symphony's petition for review, and we **GRANT** the Board's cross-petition for enforcement of its order.